[No. S033360. Aug. 14, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
KEONE WALLACE, Defendant and Appellant.

1038

1040

**COUNSEL**

David Joseph Macher, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Stephen G. Herndon and Alison Elle Alemán, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—A Fresno County jury convicted defendant Keone Wallace of the first degree murder (Pen. Code, § 187),[1] attempted rape (§§ 664, 261, subd. (a)(2)), and attempted robbery (§§ 664, 211, former § 212.5, subd. (b)) of Hazel Hamilton, and of residential burglary (§§ 459 & 460). It found true special circumstance allegations of murder in the commission or attempted commission of three felonies: robbery (§ 190.2, subd. (a)(17)(A), formerly subd. (a)(17)(i)), rape (§ 190.2, subd. (a)(17)(C), formerly subd. (a)(17)(iii)), and burglary (§ 190.2, subd. (a)(17)(G), formerly subd. (a)(17)(vii)). After a penalty trial, the jury returned a verdict of death. The trial court denied the automatic motion to modify the verdict (§ 190.4, subd. (e)) and sentenced defendant to death.[2] This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

### I. FACTS

#### A. *Guilt Phase*

##### 1. *Prosecution's case*

In January 1991, Hazel C. Hamilton, an 83-year-old widow, lived alone in a house on East Madison Avenue in the City of Fresno. She had poor eyesight, wore thick-lensed glasses, and suffered from arthritis causing her to walk with a cane.

Eulalia Gauss lived next door to Hamilton. During the evening of January 21, 1991, Gauss heard loud noises coming from Hamilton's house and went outside to investigate. She noticed that Hamilton's back bedroom window was wide open, and she saw a man wearing dark pants and a light-colored shirt, with something covering his hands. He appeared to be breaking things inside Hamilton's house.

Gauss awakened her husband, who telephoned police. Officers arrived at the scene shortly after 10:00 p.m. Officer Fred Manfredi could hear what sounded like furniture being moved and drawers being emptied inside the house, prompting him to radio his fellow officer, Raymond Sandoval, that the intruder might still be inside. Seeing a bent window screen on the ground outside the open bedroom window, Manfredi went to the front of the house to investigate. The front door was partially open and defendant was standing inside the doorway. Manfredi announced his presence and ordered defendant

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Imposition of determinate terms for the remaining convictions was stayed under section 654.

to show his hands, but defendant turned and ran through the house. After sending a radio warning to officers watching the rear of the house, Manfredi entered through the front with two other officers.

At the rear of the house, Officer Sandoval and Officer Al Hernandez saw defendant dive out the open bedroom window. The officers ordered him to the ground, but he did not comply, so they pushed him down. Defendant struggled until Officer Sandoval subdued him using a flashlight. The officers eventually handcuffed defendant. Defendant said, "They made me do it" several times, and he warned the officers that "the other guys" were getting away. He added that he "knew the lady" and "hoped that she didn't die."

A white T-shirt was wrapped around defendant's head, and he wore a beige jacket and a pair of jeans buttoned at the top only. Defendant's belt was unfastened. He had on unlaced blue athletic shoes, and he had covered his hands with dirty, worn socks. What appeared to be bloodstains were visible on defendant's T-shirt, socks, and shoes.

Police found Hazel Hamilton lying on the floor of her home about four feet inside the front door. She was breathing but unresponsive. Her dress was pulled up around her waist, the crotch of her underwear was torn, and her stockings were around her knees. She had several injuries to her head, throat, and shoulders, and her eyes were swollen shut. Blood was on her face and dress. Her eyeglasses and dentures were on the floor near her head. Paramedics took Hamilton to Valley Medical Center.

Dr. Diane Ruschke examined Hamilton and, determining her condition to be life-threatening, had Hamilton connected to a ventilator. A brain scan revealed massive bleeding and swelling in the brain, which Ruschke attributed to trauma. A neurosurgeon performed emergency surgery to alleviate the pressure on the brain.

The next day, January 22, 1991, Ruschke performed a sexual assault examination on Hamilton, observing in the vaginal area bruising that was consistent with forceful sexual penetration and that appeared to be between 12 and 24 hours old. No semen was detected during the examination, and sexual assault kits for both defendant and Hamilton were negative for the presence of semen or sperm.

On January 23, 1991, Hamilton experienced "Cushing's response," indicating brain herniation at the base of the skull. She was removed from life support and died.

Dr. Jerry Nelson performed an autopsy. He noted substantial blunt force trauma to Hamilton's upper body, with injuries that included two black eyes and multiple bruises on her head, face, neck, and shoulders. The bruises on Hamilton's neck were consistent with blunt force trauma and strangulation. Nelson determined that the cause of death was a combination of strangulation and blunt force trauma to the head, most likely caused by a fist rather than an object because of the absence of skull fractures.

Examination of the crime scene revealed that Hamilton's house had been ransacked. Dresser and cabinet drawers had been pulled out and overturned, their contents strewn about the floor. Mattresses from two beds had been turned over, as was a sofa cushion from a sleeper sofa in the living room. Smaller items also were disturbed: A container of jewelry was overturned; contents of a wicker basket were spilled onto the floor; identification cards and miscellaneous papers from a wallet were spread about the house. An empty wallet was found in front of a loveseat in the living room.

The southwest bedroom window had been forced open, as shown by scratches on its latch and locking mechanism and the presence of paint and wood chips underneath. Defendant could have made three of the handprints and fingerprints found on the window and its frame. Police found a mountain bike in the alleyway behind Hamilton's house.

Delia Heredia, a Department of Justice criminalist, compared the athletic shoes defendant was wearing at the time of his arrest with photographs of shoe impressions taken outside murder victim Hamilton's home. Although Heredia could not make a positive match, she stated that defendant's left shoe was consistent in size, sole pattern, and wear with a shoe impression near the open bedroom window by which the intruder had entered Hamilton's house.

Heredia also tested defendant's and Hamilton's clothing for the presence of human blood. Defendant's right shoe, the socks worn on his hands, his jeans, T-shirt, and jacket all tested positive, with a blood type consistent with Hamilton's. According to Heredia, most of the blood on defendant's clothing was transferred or smeared from the source, rather than resulting from blood spatter. Hamilton's dress also tested positive for blood consistent with her blood type, which she shared with 5 percent of the general population.

After defendant's arrest at Hamilton's house, Officer Sandoval transported him to Valley Medical Center and eventually to jail. Sandoval noted that although defendant's breath smelled of alcohol, he did not appear to be intoxicated. At Valley Medical Center, Dr. Thomas Utrecht treated defendant, observing abrasions on his forehead and scalp and bruising to the right side of his chest.

When medical personnel collected defendant's blood samples, he resisted, requiring two officers to restrain him. Defendant also resisted Officer Sandoval's collection of defendant's pubic hair samples, making offensive gestures and using foul language. Defendant's blood sample tested negative for drugs but positive for alcohol, with a concentration of 0.19 percent. Ernest Lykissa, Ph.D., the director of forensic toxicology at Pathological and Clinical Services in Fresno when the samples were tested, estimated that defendant's maximum blood-alcohol level at the time of his arrest was 0.21 percent. According to Lykissa, a person who habitually consumes alcohol can develop a tolerance to it, thereby reducing the impairment resulting from its consumption.

At the time of his arrest, defendant lived with Latasha Rice and her cousin in an apartment about one mile from, and on the same street as, murder victim Hamilton's house. Rice saw defendant between 11:00 a.m. and noon on the day Hamilton's house was burglarized; he did not appear to be intoxicated or under the influence of drugs.

When defendant's mother, Sharon Sperling, visited him in jail, he said he did not harm Hamilton and had been beaten by police officers. Sperling later met with Deputy District Attorney Gary Hoff. At the time of trial, Sperling could not recall what she had told Hoff, but she believed she told him that defendant had been drinking beer and watching television at a friend's house on the night Hamilton was attacked.

Hoff testified that Sperling told him defendant had consumed beer at a friend's house, and when defendant was riding his bike home, he was cut off by a police car. A second police car arrived, and defendant was beaten by police officers. Defendant denied being at murder victim Hamilton's house or assaulting her.

2. *Defense case*

Defendant testified in his own behalf at trial. He said that on January 21, 1991, he awoke around 9:00 a.m. and around noon bought two 40-ounce cans of malt liquor, which he drank at home. Around 2:00 p.m., defendant rode his bicycle to the home of his friend Herbert Johnson, where defendant drank three or four 16-ounce cans of malt liquor. Defendant and Johnson also shared a pint of brandy. When defendant left Johnson's home around 4:00 or 5:00 p.m., he was drunk.

Defendant went to the apartment of another friend, Floyd Ray, where he drank a six-pack of malt liquor. Defendant also drank two or three bottles of Cisco, a high-alcohol wine. Around 10:00 p.m., defendant left Ray's apart-

ment on his bicycle. In front of Ray's apartment complex, defendant happened upon three acquaintances he knew as Andrew, "Renn," and "Baby." After defendant drank more beer with the three men, they offered to buy him a drink. Defendant rode in the bed of Renn's truck with his bicycle. Because it was cold, defendant, who was wearing a jacket, removed his T-shirt and wrapped it around his head, and took his socks off his feet and put them on his hands.

Defendant believed Renn was driving to a liquor store; instead, the truck stopped in the alley behind Hamilton's house. Defendant stayed in the truck bed while Andrew, Renn, and Baby went into Hamilton's backyard. Andrew returned to the truck and told defendant to come with him. The two then climbed through Hamilton's bedroom window. According to defendant, his purpose in entering the house was to get a drink.

Defendant found himself in a wrecked bedroom and saw Hamilton on the floor in the living room. When Hamilton reached for a telephone, Renn punched and kicked her, causing her to fall over and hit her head on the floor. Defendant was shocked and confused by what was happening.

When police arrived at Hamilton's house, Andrew, Renn, and Baby were gone. Seeing the police, defendant panicked and dove through the bedroom window. Defendant told the police, "*they're* getting away" and "*they* made me do it," referring to his three acquaintances. Defendant admitted he had lied when he told police that he knew Hamilton.

Defendant also admitted directing abusive language towards police, explaining that police had killed two of his friends and a cousin and twice had beaten his younger brother for no reason. Defendant resisted efforts by police to collect physical evidence at the hospital, he said, because one officer ridiculed defendant's long hair. Defendant denied ransacking or taking anything from Hamilton's house, and he denied striking Hamilton or attempting to rape her.

Valerie Hurd, defendant's cousin, testified that defendant habitually drank alcohol, including Cisco and hard liquor, but he preferred malt liquor. Ruby Parks, girlfriend of Floyd Ray, testified that defendant was a heavy drinker but she had never known him to be violent when intoxicated.

Defense witnesses Herbert Johnson and Floyd Ray confirmed defendant's account of his drinking with them earlier in the day of Hamilton's attack. According to Ray, defendant left Ray's house on his bicycle around 10:00 p.m. Ray knew defendant to be a heavy drinker who drank daily, usually to

the point of intoxication, but he denied that defendant ever became violent when drunk.

Dr. Alan Barbour, a licensed clinical laboratory analyst, testified that he once was the forensic alcohol laboratory supervisor at Pathological and Clinical Services in Fresno, where he was familiar with prosecution witness Ernest Lykissa's reputation. In Barbour's opinion, Lykissa was not always truthful. Barbour disagreed with Lykissa that there was any correlation between defendant's pattern of drinking and his blood-alcohol test result. Barbour characterized defendant's 0.19-percent blood-alcohol level when the blood was drawn and tested as a "reliable" result.

Dr. Stephen Pittel, a psychologist familiar in training and experience with substance abuse, estimated that defendant's blood-alcohol level would have been between 0.21 and 0.23 percent at the time of the attack on Hamilton. Pittel testified that defendant's tested blood-alcohol level of 0.19 percent indicated severe impairment, and that his impairment would have been greater at the time of arrest.

### 3. *Prosecution rebuttal*

Dr. Howard Terrell, a psychiatrist familiar with alcohol abuse, testified that assessment of a person's alcohol intoxication level should not be based solely on blood-alcohol level, but also on behavior and demeanor. Terrell added that exclusive reliance on blood-alcohol level fails to account for alcohol tolerance. According to Terrell, a person with a high tolerance for alcohol may not be intoxicated even with a blood-alcohol level between 0.19 and 0.21 percent. Based on his review of materials provided by the prosecutor, Terrell concluded that defendant had displayed such an alcohol tolerance.

### 4. *Defense surrebuttal*

Stanley Dorance, a former Department of Justice criminalist, testified as an expert on alcohol impairment that although a person with alcohol tolerance may not show as many signs of intoxication as a person without alcohol tolerance, the person with alcohol tolerance nonetheless would be affected by the alcohol.

### B. *Penalty Phase*

### 1. *Prosecution case in aggravation*

The prosecution presented evidence of defendant's commission of prior incidents of violent behavior. The first of these took place on April 7, 1989,

in Redondo Beach, Los Angeles County, when defendant brandished a .32-caliber pistol at Marcus Robinson, threatening to shoot him. After being arrested and while being taken to jail in the backseat of a patrol car, defendant kicked out one of the car's rear door windows, and kicked an officer who tried to remove him from the car.

Two other violent incidents took place in the Fresno County jail while defendant was awaiting trial on this case. On October 3, 1991, through a surveillance camera monitor, Officer Lorrie Camplin saw an inmate wearing a white T-shirt under his jail jumpsuit strike another inmate inside the jail elevator. When the elevator came to a stop, defendant was found to be the only inmate wearing a white T-shirt, and he had abrasions on his knuckles.

On December 3, 1992, Officer David Martinez, while watching a surveillance camera monitor, saw an inmate in an elevator striking another inmate. Six officers met the elevator when it stopped on the fifth floor. Defendant was among the eight inmates inside, four of whom were sent to the infirmary.

The prosecution also presented evidence that Officer Lawrence Daluz found contraband—a loose razor blade and a jail-issued razor with half of the plastic molding removed—in defendant's jail cell. Daluz testified that razors could be used as weapons.

The parties also stipulated to defendant's February 1, 1989, felony conviction in Los Angeles County for possession of cocaine for sale. (Health & Saf. Code, § 11351.)

### 2. *Defense case in mitigation*

Andress Yancy, who was serving a 19-year state prison term for robbery, testified that he had been a Fresno County jail inmate and was with defendant during the jail elevator incident on December 3, 1992. Yancy denied being struck by defendant. He also testified that jail inmates typically used razor blades mounted on combs to cut their hair.

Some of defendant's family members and friends testified about his background and upbringing. His mother, Sharon Sperling, married Harold Autrey when defendant was two years old. During the marriage, Sperling started using drugs. Sperling and Autrey separated when defendant was about 10. For the next several years, Sperling stole merchandise from retail businesses and used cocaine. Later, she was sent to state prison.

Defendant went to live with his grandparents, who ran a garment business. While there, he lived a normal life, attending church, going fishing, and enjoying holiday celebrations. Defendant also spent time with his grandmother's sister.

When defendant was 14, his grandfather became ill, requiring dialysis and eventually the amputation of a leg. At age 16, defendant moved in with a friend. Shortly thereafter, defendant was shot and seriously injured, resulting in his use of a colostomy bag for a month.

A friend, Victor Blackmon, testified that defendant drank all day, every day, and often acted crazy and complained that his "brain" hurt. Defendant's cousin, Valerie Hurd, said that defendant drank malt liquor, starting early each morning. Latasha Rice testified that defendant would tell her he sometimes could not remember things that had happened when he had been drinking.

A clinical psychologist, Gretchen White, interviewed defendant and some members of his family. She concluded that defendant had experienced "stressors" from personal losses, such as not knowing his biological father, separation from his stepfather, and his mother's rejection when he went to live with his grandparents. White said that defendant had suffered chronic depression since adolescence. She attributed his use of alcohol to his poor coping skills.

A second clinical psychologist, Garry Bredefeld, testified to the results of several psychological and neuropsychological tests he gave defendant. Defendant functioned "within the borderline range of intelligence," having an overall IQ of 77. According to Bredefeld, defendant exhibited low self-esteem, a "generalized cerebral inefficiency," and signs of being a high risk for suicide.

### 3. *Prosecution rebuttal*

Clinical Psychologist Michael Thackrey questioned the appropriateness of the tests Dr. Bredefeld administered to defendant, expressing the view that defendant's IQ of 77 was within the normal range.

Dr. Howard Terrell testified that he had tried to conduct a psychiatric examination of defendant, but that defendant refused to participate. In Dr. Terrell's view, the evidence on which the defense experts had relied was insufficient to conclude that defendant suffered from major depression, and defendant's complaint that his "brain hurt" likely was merely defendant's description of a hangover.

### 4. *Defense surrebuttal*

Recalled by the defense, Dr. Bredefeld testified that his testing of defendant was accurate and reliable, and that there is no IQ test geared strictly

toward African-Americans, although experts in the field debate whether IQ test results are affected by race.

## II. PRETRIAL AND JURY SELECTION ISSUES

### A. *Alleged Improper Shackling*

During a pretrial hearing, defense counsel inquired about the procedure for restraining defendant in the courtroom. The courtroom bailiff, Deputy Sheriff Kevin Fitzgerald, told the trial court that defendant would be shackled to a cable installed under the defense counsel table, that the cable would be hidden by a curtain, and that defendant would be seated before the jury entered the courtroom.

Defense counsel objected to restraining defendant, citing "psychological reason[s]," and argued that shackling a capital defendant to the floor is inappropriate unless that defendant has a history of escape attempts. Deputy Fitzgerald told the court that defendant had a history of noncooperation in the county jail, and that the list of his rules violations took up three pages. To allow defense counsel to review this document, the court deferred a decision on the question of shackling.

At the next court hearing, Deputy Sheriff Victor Wisemer of the Court Services Unit gave three reasons for restraining defendant. First, the "type of case and the gravity of the outcome" warranted extra security. Second, if defendant were not restrained, at least four deputies would need to be in the courtroom to guard him. Third, and the "main reason" for restraining defendant, was his conduct in jail. According to Deputy Wisemer, defendant had 16 rules violations in roughly two years. Five of these were for fighting with other inmates and one was for possessing a sharp instrument.

Defense counsel renewed the objection, but the trial court found a manifest need to restrain defendant, based on the nature of the charges and the number of rules violations. The court indicated that the leg restraints would be concealed by the curtain and therefore not visible to the jury, adding that defendant would be seated before any juror came into the courtroom. Nothing in the record suggests that the jurors knew defendant was restrained.

Defendant now contends the trial court abused its discretion by ordering that he remain shackled throughout his trial. According to defendant, the error

violated his rights under section 688,[3] the state Constitution, and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.[4]

██ "[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290–291 [127 Cal.Rptr. 618, 545 P.2d 1322], fn. omitted.) But we will not overturn a trial court's decision to restrain a defendant absent "a showing of a manifest abuse of discretion." (*Id.* at p. 293, fn. 12.) We have said that a " ' " '[m]anifest need' arises only" ' " when the defendant has been unruly, has " ' "announced [an] intention to escape," ' " or when the evidence shows the defendant would likely " ' " 'disrupt the judicial process' " ' " if left unrestrained. (*People v. Seaton* (2001) 26 Cal.4th 598, 651 [110 Cal.Rptr.2d 441, 28 P.3d 175].) " ' " 'The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion.' " ' " (*Ibid.*)

Here, the record shows defendant had been cited for many rules violations while awaiting trial in the county jail, which included five jailhouse fights and possession of illegal razors. This evidence was sufficient to support the trial court's decision to restrain defendant. (See, e.g., *People v. Combs* (2004) 34 Cal.4th 821, 838 [22 Cal.Rptr.3d 61, 101 P.3d 1007] [the trial court did not abuse its discretion in ordering the defendant restrained where the evidence showed that the defendant had possessed two shanks in jail and threatened jail deputies].)

Further, even assuming the trial court abused its discretion, defendant suffered no possible prejudice. Determining whether or not the erroneous

---

[3] Section 688 reads: "No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge."

[4] As to this and nearly every claim on appeal, defendant asserts the alleged error violated his constitutional rights. At trial, he failed to raise some or all of the constitutional arguments he now advances. We nonetheless address the merits of these contentions: "In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581]; see also *People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765].)

imposition of restraints on a defendant was prejudicial requires us to consider the "possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system which is incident to unjustifiable use of physical restraints, as well as the effect such restraints have upon a defendant's decision to take the stand." (*People v. Duran, supra,* 16 Cal.3d at p. 290.) The first and last of these considerations are the most significant. (*People v. Anderson* (2001) 25 Cal.4th 543, 596 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

Defendant admits the record contains no indication that the jurors knew he was restrained or that they were otherwise prejudiced against him. Defendant urges us, however, to depart from the prejudice analysis we have applied for over 30 years, and to focus instead on the psychological effects on a defendant—specifically, mental impairment, physical pain, and obstruction of communication with defense counsel—that result from the imposition of restraints. Even if we were inclined to do so, defendant points to no evidence that he suffered from any such adverse effects. Nor does defendant point us to any evidence in the record that the restraint influenced his decisions to testify at the guilt phase and not to testify at the penalty phase. Indeed, defendant acknowledges that the record is silent on this point. Thus, defendant cannot demonstrate prejudice resulting from his restraint.

### B. Defendant's Right to Be Present

Twice during trial, the trial court conducted proceedings in defendant's absence. First, on February 24, 1993, defendant was not present in court when the prosecutor requested that William Darlington, Hamilton's stepgrandson and a prosecution witness, be allowed to attend the trial. After hearing briefly from defense counsel and the prosecutor, the court stated it would not continue until defendant was present. Thereafter, bailiffs brought defendant into the courtroom. The court then heard further argument and ultimately granted the prosecutor's request to have Darlington attend the duration of the trial.

The second incident occurred on March 1, 1993, when the trial court stated that an alternate juror was upset. The court had invited the alternate juror into chambers for an ex parte discussion; she informed the court that she was distressed because of her recent separation from her husband. The court said the alternate juror indicated she was able to continue, and that if she felt she could not proceed, she would immediately inform the court. The court then offered counsel the opportunity to question the alternate juror, but both sides declined. Two days later, the alternate juror concluded she was unable to proceed, and she was excused upon joint stipulation.

Defendant now contends his right to be present in accordance with state statutory law and the state and federal Constitutions was violated when the trial court conducted these proceedings in his absence. The Attorney General responds that defendant failed to preserve the issue. Defendant replies that the forfeiture rule does not apply when a trial court meets with an alternate juror outside counsel's presence, and that any later objection after the meeting would have been futile. Defendant adds that his objection to the prosecutor's motion regarding Darlington's attendance throughout the trial was sufficient to preserve the issue of defendant's right to be present. We need not resolve this dispute, however, because there was no violation of defendant's right to be present.

■ "A criminal defendant's right to be personally present at trial is guaranteed by the Sixth and Fourteenth Amendments of the federal Constitution, as well as by article I, section 15 of the California Constitution and by sections 977 and 1043 of the California Penal Code. [Citations.] A defendant, however, 'does not have a right to be present at every hearing held in the course of a trial.' [Citation.] A defendant's presence is required if it 'bears a reasonable and substantial relation to his full opportunity to defend against the charges.' [Citation.]" (*People v. Hines* (1997) 15 Cal.4th 997, 1038–1039 [64 Cal.Rptr.2d 594, 938 P.2d 388]; see also *People v. Rogers* (2006) 39 Cal.4th 826, 855 [48 Cal.Rptr.3d 1, 141 P.3d 135].) "Sections 977 and 1043 do not require the defendant's presence, or a written waiver, unless that standard has been met. [Citations.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1357 [65 Cal.Rptr.2d 145, 939 P.2d 259].) "The defendant must show that any violation of this right resulted in prejudice or violated the defendant's right to a fair and impartial trial. [Citation.]" (*People v. Hines, supra*, at p. 1039; see also *People v. Lucero* (2000) 23 Cal.4th 692, 717 [97 Cal.Rptr.2d 871, 3 P.3d 248].)

Here, the record shows that defendant was absent from the courtroom when the prosecutor brought up the issue of prosecution witness Darlington attending the trial. The record also shows, however, that the trial court waited until defendant was brought into court, and then resumed the hearing in defendant's presence. Under these circumstances, we cannot say that defendant's brief absence from the introductory part of the hearing on the issue bore " 'a reasonable and substantial relation to his full opportunity to defend against the charges.' " (*People v. Hines, supra*, 15 Cal.4th at p. 1039.)

■ We similarly find no abuse of discretion in the trial court's brief discussion with the alternate juror. " '[T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a

constitutional right to have a court reporter transcribe every such communication.' [Citation.]" (*United States v. Gagnon* (1985) 470 U.S. 522, 526 [84 L.Ed.2d 486, 105 S.Ct. 1482].) Defendant's absence from the discussion between the trial court and the alternate juror in no way adversely affected " 'his full opportunity to defend against the charges.' " (*People v. Hines, supra,* 15 Cal.4th at p. 1039.) Moreover, defendant has failed to explain how his attendance during either proceeding would have altered the outcome of his trial and accordingly has not demonstrated any prejudice. (*Ibid.*; see also *People v. Lucero, supra,* 23 Cal.4th at p. 717.)

### C. *Right of Hamilton's Stepgrandson to Attend Trial*

■ During a pretrial hearing, over defense objection, the trial court granted the prosecutor's motion under former section 1102.6 to allow prosecution witness William Darlington, murder victim Hamilton's stepgrandson, to attend the trial. That former Penal Code section provided for crime victims to be present at a criminal trial unless, in the view of the trial court, the victim's presence "would pose a substantial risk of influencing or affecting the content of any testimony" at the trial. (Former § 1102.6, subd. (a), added by Stats. 1986, ch. 1273, § 2, p. 4448 and repealed by Stats. 1995, ch. 332, § 2, p. 1824.) The former statute defined "victim" to include "up to two members of the victim's immediate family who are actual or potential witnesses" if the victim herself was "unable to attend" (former § 1102.6, subd. (e)), always the case with a murder victim.

Defendant now challenges the trial court's ruling on several bases. First, defendant argues, a "stepgrandson" is not within the term "immediate family" as set forth in the statute. Second, defendant claims that Darlington's presence allowed him to hear the prosecutor's opening statement setting forth the prosecution's theory of the case and also exposed him to the testimony of other witnesses, enabling Darlington to tailor his own testimony to that of those other witnesses. Finally, defendant argues that Darlington's constant presence in the courtroom was a silent form of improper victim-impact evidence that was not subject to cross-examination. According to defendant, allowing Darlington to attend the trial violated defendant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

We review a trial court's decision to allow a victim's family member to attend the trial for an abuse of discretion. (*People v. Griffin* (2004) 33 Cal.4th 536, 573–574 [15 Cal.Rptr.3d 743, 93 P.3d 344].) We find none here.

As noted earlier, former section 1102.6 provided for an immediate family member of an unavailable crime victim to attend a trial unless that person's presence posed a substantial risk of influencing or affecting the content of any

testimony. That section, however, did not define the term "immediate family." Nor does the legislative history reveal the intended meaning of that term. The language of the statute itself, however, made it clear that someone in Darlington's position had a right to attend the trial notwithstanding that he was testifying as a witness. (See former § 1102.6, subd. (e) ["[a]s used in this section, 'victim' means . . . (2) in the event that the victim is unable to attend the trial, up to two members of the victim's immediate family *who are actual or potential witnesses*" (italics added)].)

Other sections of the Penal Code provide some guidance on the meaning of the term "immediate family." For instance, section 3605, which addresses the selection, invitation, and attendance of witnesses to an execution, defines "immediate family" as "those persons who are related by blood, adoption, or marriage, within the second degree of consanguinity or affinity." (§ 3605, subd. (b)(2).) Section 3043.3, which relates to section 3043, the statute that addresses a victim's right to appear and comment at a state prisoner's parole eligibility hearing, defines "immediate family" as the "victim's spouse, parent, grandparent, brother, sister, and children or grandchildren who are related by blood, marriage, or adoption."

Under both of these sections, Darlington is within the definition of "immediate family" because he was victim Hamilton's grandchild (relation of the second degree) by marriage (affinity).[5] There is no indication that the Legislature intended a narrower definition of "immediate family" in former section 1102.6.

Darlington's status as a member of the victim's immediate family however, does not end our inquiry. We must also examine the trial court's ruling on the basis of the record of the proceedings before it when the ruling was made (*People v. Griffin, supra,* 33 Cal.4th at p. 574), and determine whether the trial court abused its discretion in concluding that Darlington's presence would not pose a substantial risk that he would tailor his testimony to that of other witnesses, or that he would cause other witnesses to tailor their testimony to his. Defendant offers no evidence that would suggest Darlington's presence posed such a risk, and upon our independent review of the relevant portions of the record, we find none.

Moreover, later events at trial do not suggest that Darlington tailored his testimony to conform to what he had learned from being present at trial, but instead show that he simply testified to matters he was likely to know based on personal knowledge. Darlington testified briefly on two occasions during

---

[5] See, e.g., Code of Civil Procedure section 17, subdivision (b)(9): "The word 'affinity,' when applied to the marriage relation, signifies the connection existing in consequence of marriage, between each of the married persons and the blood relatives of the other."

the guilt phase of the trial. During his first appearance, he testified that Hamilton married his grandfather in 1957, and that during the years immediately before her death Darlington visited Hamilton at her home, went on trips with her, and spoke with her on the phone. Through this contact, Darlington knew some of Hamilton's habits. For instance, Hamilton kept her front door locked with a key in the lock on the inside of the door, and she typically went to bed between 10:30 and 11:00 p.m. after activating the house alarm.

During Darlington's second brief appearance on the witness stand, he testified that Hamilton had visual difficulty. Specifically, he recalled being in the country with Hamilton, and that she could not see nearby raccoons until they were right in front of her. He also testified that because of problems with her knees, she had difficulty maintaining her balance.

Thus, the record reveals that Darlington had the opportunity to personally observe Hamilton and to describe her health and habits from his independent knowledge of her, and defendant does not point to any evidence to establish otherwise.

For the reasons set forth above, the trial court did not abuse its discretion in allowing Darlington to attend defendant's trial.

### D. *Alleged Error in Ruling on Defense Challenges for Cause*

■ A trial court may discharge a juror whose views on the death penalty "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].) Defendant contends the trial court erroneously refused to excuse seven "pro-death" jurors for cause, claiming that their "support for capital punishment was so insistent" that they were "substantially impaired in their ability to perform their duties in accordance with the law and [their] oath." As a result, defendant claims a denial of his right to a fair and impartial jury under the Sixth Amendment to the federal Constitution.

This contention is not cognizable on appeal. (See *People v. Beames* (2007) 40 Cal.4th 907, 924 [55 Cal.Rptr.3d 865, 153 P.3d 955]; see also *People v. Avila* (2006) 38 Cal.4th 491, 539 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) Jury selection in this case took place in 1993, before our decision in *People v. Crittenden* (1994) 9 Cal.4th 83, 121, footnote 4 [36 Cal.Rptr.2d 474, 885 P.2d 887], made clear that a defendant must express dissatisfaction with the final jury before it is sworn, so that rule does not apply here. Defendant nonetheless has forfeited this issue because he did not exhaust all of his peremptory challenges, nor does he make any attempt to justify his failure to do so. (*People v. Beames, supra,* at p. 924; *People v. Avila, supra,* at p. 539.)

In any event, defendant fails to show prejudice. " 'To prevail on such a claim, defendant must demonstrate that the court's rulings affected his right to a fair and impartial jury.' [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1099 [40 Cal.Rptr.3d 118, 129 P.3d 321].) Here, none of the seven purportedly "pro-death" jurors served on defendant's jury. Thus, the trial court's failure to excuse these prospective jurors could not possibly have affected the fairness of the jury that decided defendant's case. (*People v. Weaver* (2001) 26 Cal.4th 876, 913 [111 Cal.Rptr.2d 2, 29 P.3d 103]; *Ross v. Oklahoma* (1988) 487 U.S. 81, 86 [101 L.Ed.2d 80, 108 S.Ct. 2273].)

Nor, contrary to defendant, did the trial court's refusal to excuse the seven prospective jurors "pollute the jury pool," "alter the random order," or "force" the defense "to make further challenges for cause or exercise peremptory challenges which could have been saved for more productive use." (See *People v. Yeoman* (2003) 31 Cal.4th 93, 114 [2 Cal.Rptr.3d 186, 72 P.3d 1166] [loss of a peremptory challenge is a ground for relief " ' "only if the defendant exhausts all peremptory challenges *and an incompetent juror is forced upon him*" ' "]; see also *Ross v. Oklahoma, supra,* 487 U.S. at p. 88 [rejecting the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury].)

### III. Guilt Phase Issues

#### A. *Alleged Bailiff Misconduct*

At some point during the trial proceedings, defendant asked defense counsel for a piece of paper and a pen. Upon receipt of these items, defendant wrote a note and gave it to defense counsel, who shared its contents with defendant's mother. The courtroom bailiff, Deputy Sheriff Kevin Fitzgerald, told defense counsel that her actions were "illegal." Shortly thereafter, defense counsel asked the court to replace Fitzgerald with a different bailiff because counsel was "uncomfortable" with Fitzgerald's presence, "unhappy with the atmosphere in [the] courtroom because of" him, and "afraid for [her] client." According to counsel, Fitzgerald made the trial proceedings "intolerable." The trial court denied the motion, acknowledging, however, that communications between attorney and client are "privileged and confidential and are no business of the bailiff."

Defendant now contends Deputy Fitzgerald's conduct infringed upon his attorney-client privilege, and that the trial court erred in denying the motion to replace him, thereby violating defendant's rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments, and his right to heightened reliability under the Eighth Amendment. We disagree.

In support of his claim of infringement of the attorney-client privilege, defendant compares his situation to that in *Morrow v. Superior Court* (1994)

30 Cal.App.4th 1252 [36 Cal.Rptr.2d 210], in which the prosecutor told her investigator to eavesdrop on a conversation between the defendant and his attorney in the courtroom's holding cell. The Court of Appeal there concluded: "Where the prosecutor uses the courtroom as a place to eavesdrop upon privileged attorney-client communications, which results in the acquisition of confidential information, the conscience of the court is shocked and dismissal is the appropriate remedy." (*Morrow v. Superior Court, supra*, 30 Cal.App.4th at p. 1255.)

*Morrow* is distinguishable in two significant respects. First, unlike the investigator in *Morrow*, Deputy Fitzgerald did not intentionally put himself in a position to "eavesdrop" upon communications protected by the attorney-client privilege. Second, nothing in the record suggests that Fitzgerald acquired any confidential information. Therefore, we cannot say that Fitzgerald's actions infringed upon defendant's attorney-client privilege.

■ With respect to the trial court's decision not to replace Deputy Fitzgerald, trial courts possess broad power to control their courtrooms and maintain order and security. (Code Civ. Proc., § 128, subd. (a)(1)–(5); *People v. Woodward* (1992) 4 Cal.4th 376, 385 [14 Cal.Rptr.2d 434, 841 P.2d 954].) The trial court chastised Fitzgerald for not bringing to the court's attention any questions about the note passing rather than addressing the issue himself, but then expressed confidence in Fitzgerald's abilities to maintain order in the courtroom and a clear preference that he remain. We discern no abuse of discretion in the ruling. Defendant's claims of state law error and constitutional violations are meritless.

### B. Miscellaneous Evidentiary Issues

Defendant asserts error in certain evidentiary rulings. We discuss these claims below.

#### 1. Evidence of Hamilton's physical condition

Over defendant's objections of lack of relevance (Evid. Code, § 210) and more prejudicial than probative (*id.,* § 352), the trial court allowed the prosecutor to introduce evidence of victim Hamilton's poor eyesight and mobility problems. Defendant now contends the trial court's ruling was in error and also asserts that admission of this evidence violated his United States Constitution Fifth, Sixth, Eighth, and Fourteenth Amendment rights to a fair trial, due process of law, and a reliable penalty determination. We disagree.

On appeal, we review for an abuse of discretion a trial court's admission of evidence as relevant. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1123 [113

Cal.Rptr.2d 27, 33 P.3d 450]; *People v. Pollock* (2004) 32 Cal.4th 1153, 1171 [13 Cal.Rptr.3d 34, 89 P.3d 353].) None appears.

■ Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; see *People v. Kipp, supra*, 26 Cal.4th at p. 1123.) " 'The test of relevance is whether the evidence tends " 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." ' " (*People v. Guerra, supra*, 37 Cal.4th at p. 1117.) Here, the trial court found that evidence of Hamilton's physical condition was relevant to defendant's intent, to Hamilton's ability to recognize and resist an intruder, and to the number of intruders who were in Hamilton's house. Defendant challenges the court's reasoning, in particular the notion that Hamilton's poor eyesight and limited mobility were relevant to the number of intruders in her house.

Even assuming the trial court abused its discretion in admitting this evidence, defendant suffered no possible prejudice. The jury already knew that Hamilton was a frail 83-year-old woman, and thus the evidence regarding her poor eyesight and use of a cane would not have inflamed the jury.

■ Further, the trial court did not abuse its discretion in admitting the evidence over defendant's Evidence Code section 352 objection. That section affords a trial court discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

The testimony of Hamilton's neighbor, June Bryant, was brief and unsensational; thus, its probative value was not substantially outweighed by concerns of undue consumption of time or risk of prejudice to defendant. Further, given that Bryant was the first witness to testify about Hamilton's physical condition, there was no danger that this evidence would be cumulative.

Witness Darlington also testified briefly about Hamilton's physical condition. His testimony followed that of Bryant and Yula Nagy, Hamilton's daughter, whose testimony about her mother's physical condition was limited to the statement that she "couldn't be without [her eyeglasses.]" Darlington testified that Hamilton appeared to have difficulty with her eyesight and was unable to see a raccoon at a distance of 10 feet. Darlington also testified that Hamilton had difficulty with mobility and that whenever she arose from a seated position, it took her some time to get her bearings before she was stable enough to move.

Darlington's testimony, like Bryant's, was brief and matter of fact. Although Darlington was the third prosecution witness to refer to Hamilton's physical condition, we cannot say the trial court abused its broad discretion under Evidence Code section 352 in allowing his testimony. Further, the trial court's decision to sustain defendant's Evidence Code section 352 objection to the proposed testimony of Dr. Newel, an eye doctor, whose proffered testimony would have included that Hamilton "wore thick spectacles, had damaged one cornea so she could really only see out of her right eye and was significantly visually handicapped" demonstrates the court's mindfulness of the potential prejudicial effect of overemphasizing Hamilton's physical condition. Therefore, we conclude the trial court properly exercised its discretion in overruling defendant's Evidence Code section 352 objection to the evidence of Hamilton's physical ailments.

### 2. *Evidence that Hamilton slept with open bedroom window*

During the defense case-in-chief, defendant proposed to call Verdie Smith, murder victim Hamilton's next-door neighbor for over 20 years, to testify about Hamilton's custom and habits. According to defense counsel's offer of proof, Smith would testify that Hamilton told Smith of her need for fresh air, that Hamilton "always" slept with the window slightly open, that Smith believed that the house alarm was set up so that a slightly ajar window would not trip the alarm, and that on one occasion Smith saw Hamilton's bedroom window open.

During the foundational hearing held outside the jury's presence, Smith testified that Hamilton told her that she kept her window open "some" and that Smith observed it open "some" on one occasion in the daytime. Although conceding she may have told the district attorney during an interview that Hamilton always slept with the window open, Smith testified: ". . . I don't know that she did. [¶] . . . [¶] I may have said that, but I don't see the window at night. I don't know." Smith further admitted that her statement that the window could open without tripping the alarm was not based on personal knowledge, but on what Hamilton told her. The prosecutor objected to Smith's proposed testimony on the grounds that it was inadmissible character evidence as well as hearsay. The court sustained the prosecutor's hearsay objection, without further argument from defendant.

Defendant now claims the trial court erred in excluding Smith's testimony, thereby violating his right to present a defense under both the state and federal Constitutions. At trial, however, defendant did not explain the relevance or purpose for the proffered evidence. Defendant's failure to do so precludes him from challenging on appeal the exclusion of the evidence. (Evid. Code, § 354, subd. (a); *People v. Morrison* (2004) 34 Cal.4th 698, 711

[21 Cal.Rptr.3d 682, 101 P.3d 568] [" 'As a condition precedent to challenging the exclusion of proffered testimony, Evidence Code section 354, subdivision (a), requires the proponent make known to the court the "substance, purpose, and relevance of the excluded evidence . . . ." ' [Citation.]") Further, any error in excluding the evidence was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] [state law error is prejudicial only if it is reasonably probable that a result more favorable to defendant would have been reached absent the error].)

 Defendant states that the defense theory was that Hamilton slept with the window open, a theory that rendered the use of force to enter her house unnecessary. According to defendant, this "theory was important, for entry into an open window is a far cry from carrying a tool to the scene in order to force open a window." The crime of burglary, however, requires only an entry *with the requisite intent*; the entry need not be accomplished by force. (§ 459; see 2 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against Property, § 120, p. 151.)

Defendant further contends that entry into Hamilton's house through an open window would preclude a finding of an intent to steal or commit another felony necessary to the crime of burglary. In addition to being illogical, this contention is contrary to the defense theory of the case—that defendant arrived at Hamilton's house intoxicated and entered the house through a window to obtain another alcoholic beverage. Even crediting defendant's claim, his own theory supports the conclusion that he entered the home to *steal* liquor. Under these circumstances, therefore, we cannot say that the trial court's error in excluding Smith's testimony was prejudicial.

### 3. *Alleged chain of custody violation regarding defendant's socks*

Officer Raymond Sandoval testified that when defendant was arrested, he was wearing socks on his hands. The socks were "old and worn," and defendant's fingers protruded through holes in the socks. Sandoval noticed a "red substance similar to blood" on the socks. Sandoval identified a pair of socks as the ones he removed from defendant's hands at the time of his arrest. As offered into evidence, each sock was in an individually labeled envelope fastened by a clasp at the top. In turn, these envelopes, which bore the Fresno Police Department case number for defendant's case, were contained within another envelope, which the prosecutor unsealed with scissors in the courtroom.

Defense counsel asserted that the prosecutor failed to present an adequate chain of custody for the socks. Counsel objected that the outer envelope

containing the two individually labeled envelopes was dated 1993, whereas the individual envelopes were dated June 19, 1991.

Outside the jury's presence, the trial court questioned Officer Sandoval, who explained that he recognized the socks as those he processed in the department's property room, that he put the socks in containers, but not in the envelopes being used at trial. Sandoval stated that the socks were in the same condition as when he observed them at the time of defendant's arrest, except that a small "sample" had been cut from each sock. Under questioning by defense counsel, Sandoval testified that he did not initial or otherwise mark any of the envelopes, and that he was informed by members of the property room staff that the evidence had been repackaged several times. Sandoval admitted that the absence of markings on the envelopes to establish chain of custody violated the standard operating procedure for the Fresno Police Department's property room.

The trial court overruled defendant's objection, noting Officer Sandoval's testimony that he recognized the socks and that except for the removal of a sample for analysis, the socks were in the same condition as at the time of defendant's arrest.

Defendant now contends the trial court abused its discretion in admitting the socks into evidence because there was no recorded chain of custody information from the time of defendant's arrest to the placement of the socks in individual envelopes, or for the period between June 19, 1991 (the date on the individual envelopes), and 1993 (the date on the outer envelope). Although the record of the chain of custody in this case was far from perfect, we disagree with defendant that these shortcomings rendered the admission of the socks an abuse of the trial court's discretion. (See *People v. Williams* (1997) 16 Cal.4th 153, 196 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

■ "*People* v. *Riser* (1956) 47 Cal.2d 566 [305 P.2d 1] sets forth the rules for establishing chain of custody: 'The burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight.' [Citations.]" (*People v. Diaz* (1992) 3 Cal.4th 495, 559 [11 Cal.Rptr.2d 353, 834 P.2d 1171].)

Here, defendant does not suggest that the socks were tampered with, he merely asserts it was "as likely as not" that the socks tested by the prosecution's criminalist were not the same ones confiscated from defendant at the time of his arrest. He ignores, however, Sandoval's positive identification of the socks at trial. Under these circumstances, the trial court acted within its discretion in admitting the socks into evidence.

### 4. Admission of expert testimony of criminalist Delia Heredia

Defendant contends the trial court erred by overruling a foundational objection to the qualifications of criminalist Delia Heredia, who ultimately testified as an expert witness regarding blood transfer and blood spatter evidence. According to defendant, the trial court's error allowed a "patently unqualified witness . . . to render devastating opinions on blood evidence which allowed the prosecutor to make a much more powerful closing argument."

At the time of trial, Heredia had been a criminalist in the Fresno Regional Laboratory of the California Department of Justice for six years. Heredia had a bachelor's degree from Fresno State University in biology, with a chemistry minor. She received training from the California Criminalistics Institute and from a doctor with the Metropolitan Police Laboratory in London, England.

Under questioning by defense counsel, Heredia revealed that she had 40 hours of training at the California Criminalistics Institute, including a course on bloodstain interpretation, and that she also had received more than 40 hours of training on that topic for the Department of Justice. Heredia further noted that she had read many books and articles on bloodstain interpretation, and that she kept current with her reading on the subject. Although Heredia had never qualified previously as a courtroom expert on bloodstain interpretation, she had made over 20 determinations differentiating between blood transfers and blood spatters at crime scenes.

Over defense objection, the trial court allowed Heredia to testify regarding blood transfer and spatter evidence. Heredia testified that most of the bloodstains—which were consistent with Hamilton's blood type and inconsistent with defendant's—found on defendant's clothing appeared to be transfers or smears, rather than spatters. A blood transfer or smear indicates that the perpetrator and victim somehow made contact to effectuate the transfer of blood from one surface to another, whereas a blood spatter indicates that the blood left one surface and was airborne until landing on the second surface.

"We are required to uphold the trial judge's ruling on the question of an expert's qualifications absent an abuse of discretion. [Citation.] Such abuse of

discretion will be found only where ' "the evidence shows that a witness *clearly lacks* qualification as an expert . . . ." ' [Citation.]" (*People v. Chavez* (1985) 39 Cal.3d 823, 828 [218 Cal.Rptr. 49, 705 P.2d 372].)

Here, the trial court did not abuse its discretion in finding Heredia qualified to testify on bloodstain interpretation. Given Heredia's education and her training and practical experience in the Department of Justice's Fresno Regional Laboratory, we cannot say that Heredia "clearly lack[ed]" qualifications as an expert. (See, e.g., *People v. Bolin* (1998) 18 Cal.4th 297, 322 [75 Cal.Rptr.2d 412, 956 P.2d 374] [witness with educational background in biochemistry and serology and training as a criminalist for 13 years, including attending and giving seminars in blood spatter analysis and crime scene investigation, was qualified to testify as blood spatter expert]; *People v. Clark* (1993) 5 Cal.4th 950, 1018–1019 [22 Cal.Rptr.2d 689, 857 P.2d 1099] [no abuse of discretion in allowing testimony of blood spatter expert where witness had "(1) attended lectures and training seminars on the subject of blood dynamics in both California and Oregon; (2) read relevant literature; (3) conducted relevant experiments; and (4) visited crime scenes where 'blood-spatter' tests were conducted" (fn. omitted)].) For the same reasons that allowing Heredia's testimony did not violate state law, it did not render defendant's trial fundamentally unfair in violation of the federal Constitution.

Moreover, contrary to defendant's characterization, the prosecutor made only a brief reference to Heredia's testimony during closing argument. Even assuming Heredia was not qualified to render an opinion on bloodstain interpretation, defendant suffered no possible prejudice as a result of the testimony.

### C. *Denial of Defense Motion for Mistrial*

During the guilt phase, the prosecutor presented the testimony of forensic toxicologist Ernest Lykissa, Ph.D., to establish that, despite a high blood-alcohol level, defendant was capable of forming the requisite intent to commit the crimes. Lykissa testified about drug and alcohol analysis of blood samples taken from defendant after his arrest. At that time, Lykissa was the director of forensic toxicology for Pathological and Clinical Services in the Fresno area. The test results were negative for various controlled substances but positive for alcohol, with a measured level of 0.19 percent. Lykissa testified that defendant's maximum blood-alcohol level at the time of arrest was 0.21 percent. He also testified that a person's level of impairment from alcohol ingestion varies, and that habitual alcohol use causes alcohol tolerance, which may reduce the degree of impairment.

On cross-examination, defense counsel attacked Lykissa's credibility. Lykissa stated he had consulted with Forensic Toxicology Associates in

Pasadena and had used the firm as an employment reference. He denied ever being accused of falsifying reports or documents he claimed to have authored, and he denied being aware that individuals in the scientific community considered his reputation tarnished. He also denied asking Dr. Alan Barbour, a subordinate at Pathological and Clinical Services whose employment Lykissa claimed he ultimately terminated, to endorse his state application to become a certified forensic alcohol analyst.

During defense counsel's recross-examination of Lykissa, this exchange took place:

"[Defense Counsel:] What is your general reputation within the Fresno area, if you know it, among the scientific individuals who are similarly situated as you in regards to truth or veracity?

"[Lykissa:] I believe I'm the only—when I was in the Fresno area I was the only forensic toxicologist of the doctorate level in the Fresno area. I think Mr. [Forensic Analyst William] Posey, as I said, he has been always on the other side of the bench whenever I testified in court.

"[Defense Counsel:] But I'm not asking about Mr. Posey right now. I'm asking about your reputation.

"[Lykissa:] Sir, you are the judge of my reputation, not myself.

"[Defense Counsel:] Let me rephrase the question.

"[Lykissa:] Why don't you tell me my reputation.

"[Defense Counsel:] I'll ask you the question. Are you aware there were other individuals who believe that you have on a routine basis falsified reports and records?

"[Prosecutor:] Speculation and relevance as to belief of other individuals.

"[Court:] Well, basically it's not the—it is not phrased on the basis of reputation in the community. The objection is sustained.

"[Defense Counsel:] Are you aware there are individuals within the scientific community who believe that your reputation is tarnished?

"[Lykissa:] Sir, I bet you there are enough individuals in Fresno that believe your reputation is tarnished.

"[Court:] That wasn't the question Doctor.

"[Lykissa:] I don't know that.

"[Court:] Let's answer the question that's asked of you, sir.

"[Lykissa:] No, no, sir.

"[Defense Counsel:] Have you ever been accused of falsifying a report?

"[Lykissa:] Never, sir.

"[Defense Counsel:] Have you ever been accused of falsifying documents which you indicate you have authored?

"[Lykissa:] Never, sir."

After redirect examination by the prosecutor, this exchange took place during defense counsel's further recross-examination:

"[Defense counsel:] Assuming approximately 10:23 p.m. was approximately sixty-two minutes before [the time defendant's blood was drawn], can you tell me what the known blood alcohol level [for] my client would be?

"[Lykissa:] As I said using the burn-off rate—using the burn-off rate, a .02 I will place him at very safely at .21. I can use the Boston and .03 so let's make it .22.

"[Defense Counsel:] So you're saying that's a safe assumption that at 10:23 he was at approximately a .22?

"[Lykissa:] Would I say so, yes.

"[Defense Counsel:] So that means that at 10:23 he was higher than he was at 11:25?

"[Lykissa:] Yeah, because there was no alcohol consumed in the hour—I'm assuming that there was no alcohol consumed between 10:23 and 11:25.

"[Defense Counsel:] I'm sorry. Your first assumption is that there was no alcohol consumed between the period of time; is that correct?

"[Lykissa:] 10:23 and 11:25.

"[Defense Counsel:] And any other assumptions?

"[Lykissa:] Yeah. Also he wasn't drinking while he was committing his crime.

"[Defense Counsel:] You're assuming he committed a crime.

"[Lykissa:] I don't know.

"[Defense Counsel:] He wasn't drinking during the period of activity—

"[Lykissa:] We wouldn't be here if he didn't commit something.

"[Court:] Oh, just a minute. The jury is admonished. Listen. Listen. I run the courtroom according to the rules of evidence in the State of California. Your comment is out-of-order, sir.

"[Lykissa:] I'm sorry.

"[Court:] You ought to know better. And the jury's admonished to disregard the comment that the witness made.

"[Lykissa:] I'm sorry, your Honor.

"[Court:] This is not a game. It's not a place of amusement, it is a place of intellectual inquiry and the search for truth. And we don't get arguments from witnesses, we get them from the attorneys based on evidence that is properly received in the courtroom. So just answer the questions is all we ask. And be responsive and not entertaining."

After excusing the jury for lunch, the trial court continued:

"[Court:] I don't know, Dr. Lykissa, whether you've been testifying in Justice Courts or Municipal Courts but for you to state that the defendant, if he didn't do something he wouldn't be here, that is not an opinion of a toxicologist, it is someone—an opinion of someone who wants to be a smart aleck.

"[Lykissa:] I apologize, your Honor.

"[Court:] Well, you ought to know better. Maybe you've been testifying—I thought you've been testifying in Federal Courts and so forth where you generally knew the rules, but—

"[Lykissa:] I thought I was responding—I'm sorry, your Honor.

"[Court:] Well, you respond—

"[Lykissa:] You're right."

Defense counsel then moved for a mistrial. The trial court denied the motion, stating, "I think that I acted so quickly and so promptly upon hearing . . . the witness' response, and with such clarity with regard to the inappropriateness of the witness' comment not even waiting for an objection because that type of response from an expert witness who should know better is so inappropriate that the court acted on its own motion, and I'm sure that the jury clearly got the court's view and that it was inappropriate and struck the comment and admonished the jury to disregard it. We're not in a Justice Court, this is a very serious case and while everyone testifies with their own personality and their own way they should stick to their field of expertise and not get into argument on behalf of the party calling them. [¶] The court feels that the promptness . . . of the admonition clearly conveyed the impropriety of the comment to the jury and I have every reason to believe that they were disregarded in accordance with the admonition and instruction of the court and I think that under the circumstances that is certainly adequate to cause the jury to disregard the comment."

During the lunch recess, Alternate Juror R.W. asked the court to be excused from jury service, stating: "I don't feel that I can any longer be a competent juror since I have been biased by the actions of the defense attorney and the expert witness. This has been a dog-and-pony show all morning." Alternate Juror R.W. added, "I could not give an unbiased opinion any longer because this is obviously a show between the two of these witnesses who—it was carried over from another trial some place and it's coming into this courtroom." Alternate Juror R.W. said he had "sacrificed enough to be here for what I am and now the unprofessional action of these two people has made me a little angry." The trial court found "good cause" and thus excused the alternate juror from further service. Before leaving, Alternate Juror R.W. said he had not shared his feelings with other jurors and did not hear any of them discuss what had transpired during defense counsel's cross-examination of Lykissa.

After the lunch recess, Dr. Lykissa returned to the stand. On further redirect examination, this exchange took place:

"[Prosecutor:] Dr. Lykissa, in your career, is there anything that you have participated in that has affected the career of this person by the name of Posey?

"[Lykissa:] Most definitely, yes, sir.

"[Prosecutor:] And what is that?

"[Lykissa:] I feel that in my capacity as a forensic toxicologist here in Fresno and also in . . . Tulare County having worked with analyzing most of the specimens that were being produced by the various law enforcement agencies in these two counties, including Merced and some of the northern San Francisco areas, I found myself in a conflict of business interest with Mr. Posey. And at the same time I have found myself on numerous occasions in an adversarial position with Mr. Posey. I have spoken with nothing but respect about the gentleman and some of the insinuations that were brought into this court though the incentives are very clear to me—I find him very offensive and maybe my response, my immature and unwarranted response created the scene before the break for which I apologize to all of you present with the extreme prejudice or due to the fact that some attacks to my credibility as a scientist were brought into this courtroom."

Defendant now contends the trial court's failure to grant the defense mistrial motion "perverted the presumption of innocence and undermined the burden of proof." According to defendant, the trial court's admonition was insufficient to cure any prejudice that resulted from Lykissa's "outrageous misconduct." As proof, defendant points to Alternate Juror R.W.'s request to be excused after witnessing the exchange between Lykissa and defense counsel. We reject this contention.

 In reviewing rulings on motions for mistrial, we apply the deferential abuse of discretion standard. (*People v. McLain* (1988) 46 Cal.3d 97, 113 [249 Cal.Rptr. 630, 757 P.2d 569].) "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" (*People v. Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776].)

Here, the trial court did not abuse its discretion in denying defendant's motion for a mistrial. Although the exchanges between defense counsel and Lykissa resulted in the court's good cause excusal of one alternate juror, that alternate juror neither shared his feelings with any of the seated or alternate jurors nor heard any of them discuss the behavior he found so offensive. The trial court's admonition to the jury was stern and immediate, and it occurred before defense counsel even had an opportunity to object to Lykissa's inappropriate comments. Lykissa apologized for his behavior three times before the jury—twice immediately after his improper reference to defendant's guilt and a third time when he returned to the witness stand after the

noon recess. Under these circumstances, the trial court properly exercised its discretion in denying defendant's motion for mistrial.

### D. *Refusal to Allow Impeachment of Prosecution Witness Ernest Lykissa*

As noted above, the prosecution called Lykissa to prove that defendant's high blood-alcohol level did not preclude him from forming the requisite intent to commit the charged crimes. Defense counsel sought to impeach Lykissa with the testimony of Dr. Alan Barbour, Lykissa's former colleague. Outside the jury's presence, Barbour testified that when he and Lykissa were colleagues in the same laboratory, Lykissa submitted, without Barbour's knowledge, an application for certification by the state as a forensic alcohol analyst. Lykissa's application required Barbour's signature, as the person responsible for forensic alcohol analysis, and that of Dr. Jerry Nelson, the forensic alcohol laboratory administrator. Barbour explained that the State Department of Health Services returned one of the forms from Lykissa's application, along with a letter requesting further documentation of his experience. Barbour testified that Lykissa added a line on the application indicating he had experience as an analyst at Forensic Toxicology Associates in Pasadena. Barbour said he called the owner and administrator of that laboratory, who told Barbour that although she knew Lykissa, he had never been involved in forensic alcohol analysis at the facility. Barbour refused to sign Lykissa's application, because he "could not in good conscience" vouch for Lykissa's qualifications under penalty of perjury.

The trial court sustained the prosecutor's Evidence Code section 352 objection to testimony explaining why Barbour did not sign Lykissa's application and what he learned in his attempt to verify Lykissa's employment with Forensic Toxicology Associates in Pasadena, ruling that allowing evidence on such "an incidental and very collateral matter" would unduly consume time.

Before the jury, Barbour testified Lykissa was not licensed to perform forensic alcohol analysis. He also said he had discovered Lykissa's representations in another case to be untrue, and he expressed an opinion that Lykissa does not always tell the truth. Finally, Barbour denied having been fired from Pathological and Clinical Services, explaining that he left because of a reduction in workforce.

Defendant now claims the trial court's ruling limiting Barbour's testimony to impeach Lykissa violated his Sixth and Fourteenth Amendment rights to confrontation, to present a defense, and to due process of law. Defendant argues that because Lykissa was "a central figure" in the prosecutor's strategy

to nullify the defense theory of the case—that defendant was so intoxicated at the time of the homicide that he did not have the requisite intent to commit the crimes, and that the crimes were committed by an acquaintance without defendant's consent—he should have been given wide latitude to probe Lykissa's veracity. Further, defendant claims that because of the trial court's limitation of Barbour's testimony, the jury was free to dismiss the defense attempt to impeach Barbour as Barbour's personal grudge against Lykissa for having fired him.

We review for abuse of discretion the trial court's ruling sustaining the prosecutor's Evidence Code section 352 objection to Barbour's proposed testimony. (*People v. Pollock, supra,* 32 Cal.4th at p. 1171.) We find none here.

The trial court did not prevent Barbour from stating his opinion that Lykissa was not always truthful, from contradicting Lykissa's account that Barbour was fired from Pathological and Clinical Services, or from offering an alternate explanation for his departure. Barbour's testimony, therefore, achieved precisely what defendant wanted—it called into question Lykissa's reputation for veracity. Under these circumstances, the trial court properly exercised its discretion under Evidence Code section 352 and did not violate defendant's constitutional rights in limiting Barbour's testimony.

### E. Alleged Prosecutorial Misconduct

Defendant claims several instances of prejudicial misconduct by the prosecutor in violation of his constitutional rights to a fair trial and due process under the Sixth and Fourteenth Amendments of the United States Constitution. We disagree.

 As we explained in *People v. Earp* (1999) 20 Cal.4th 826 [85 Cal.Rptr.2d 857, 978 P.2d 15], on claims of prosecutorial misconduct our state law standards differ from those under the federal Constitution. With respect to the latter, conduct by the prosecutor constitutes prosecutorial misconduct only if it " ' " 'so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process.' " ' " (*People v. Earp, supra,* at p. 858; see *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642 [40 L.Ed.2d 431, 94 S.Ct. 1868]; accord, *People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11].) By contrast, our state law considers it misconduct when a prosecutor uses " ' " 'deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Earp, supra,* at p. 858; accord, *People v. Morales, supra,* at p. 44; *People v. Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d

204]; *People v. Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].) One such means is "eliciting or attempting to elicit inadmissible evidence" in defiance of a court order. (*People v. Crew* (2003) 31 Cal.4th 822, 839 [3 Cal.Rptr.3d 733, 74 P.3d 820].) "A defendant's conviction will not be reversed for prosecutorial misconduct" that violates state law, however, "unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*Ibid.*)

Defendant cites as instances of prosecutorial misconduct certain questions by the prosecutor, including the cross-examination of defendant and defense expert witnesses Pittel and Barbour, and certain comments and behavior during trial. We have considered these contentions both singly and together and conclude that they did not " ' " 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process' " ' " in violation of the federal Constitution. (*People v. Earp, supra*, 20 Cal.4th at p. 858; see *Darden v. Wainwright, supra*, 477 U.S. at p. 181; *Donnelly v. DeChristoforo, supra*, 416 U.S. at p. 642.) We now consider whether the prosecutor's conduct constituted prejudicial misconduct under state law. We conclude it did not, as explained below.

Defendant contends the prosecutor's cross-examination of certain witnesses placed inadmissible material before the jury. With respect to the cross-examination of defendant, one claim is that in asking him to review a copy of a defense investigator's report, the prosecutor improperly exposed the jury to hearsay information in the report. For example, the prosecutor asked whether the exhibit refreshed defendant's recollection that when defendant "left Floyd's [house] for the last time that night[,] that [Floyd] followed [defendant] out." The trial court sustained the defense objection and the prosecutor rephrased the question. The crux of defendant's claim is that the prosecutor defied a court order in referring in his questioning of defendant to the contents of the defense investigator's report. We agree this was misconduct. (See *People v. Crew, supra*, 31 Cal.4th 822, 839.) Defendant further claims that the prosecutor asked argumentative questions and on four separate occasions improperly commented on defendant's answers with phrases such as "Really" or "I see." On the facts of this case, however, no reasonable probability exists that without the objectionable comments or inclusion of improper material in the prosecutor's questioning of defendant the jury would have reached a guilt phase verdict more favorable to defendant.

We now turn to defendant's claim of prosecutorial misconduct in questioning defense expert Pittel, who testified on direct examination about defendant's intoxication when arrested for the murder of Hamilton. On cross-examination, Pittel testified that defendant's obstreperous behavior at the time of his arrest was evidence of intoxication. When the prosecutor

asked whether this behavior "impressed" Pittel, the trial court directed the prosecutor to inquire about Pittel's opinions, not his impressions. After the trial court sustained a defense objection that the prosecutor's rephrasing of the question "suggest[ed] facts . . . not in evidence," the prosecutor rephrased his question as a hypothetical, asking Pittel to assume that defendant had fought with police on other occasions, and then inquiring whether that would affect his opinion of defendant's intoxication at the time of arrest. The trial court overruled defendant's objection to this rephrased question, and Pittel responded that the assumed facts would not alter his earlier assessment.

Defendant now contends this questioning was prosecutorial misconduct that served no purpose other than suggesting to the jury that he had previously fought with police. We disagree. Once Pittel expressed the opinion that defendant's actions when arrested were evidence of his intoxication, the prosecutor was entitled to ask whether Pittel's opinion would be the same if defendant had previously engaged in the same sort of violent conduct when not intoxicated. In any event, defendant suffered no possible prejudice.

With respect to defense expert Barbour, defendant points out that the trial court sustained a defense relevancy objection to evidence that a portion of defendant's blood sample taken on the night of his arrest had been released *to the defense* for testing. The parties then stipulated, and the jury was advised, that the blood sample was not consumed by the prosecution's testing. Defendant contends that the prosecutor committed misconduct by violating the trial court's ruling in asking defense expert Barbour whether some of defendant's blood sample had been "released for independent analysis." Barbour answered that the blood sample was released to "one Art Warfield," a defense investigator. Defense counsel objected, and the trial court excused the jury. Counsel then argued that the question exceeded the scope of direct examination and was contrary to the blood-sample stipulation. The prosecutor asserted that the stipulation only went to whether any blood sample remained after the initial testing, and that the question was appropriate because the defense had attacked the credibility of the prosecutor's blood-sample analyst but had not offered any evidence of a different blood analysis. The trial court ruled that the prosecutor's question improperly sought defense work product, and the prosecutor dropped the matter. Assuming the prosecutor's question of defense witness Barbour was misconduct, and that the defense has adequately preserved this issue for appeal, no prejudice appears. It was not reasonably probable that in the absence of Barbour's answer the jury would have reached a different guilt phase verdict in this case.

Defendant also claims the prosecutor "yawned" during the defense opening statement and cross-examination. When defense counsel objected on this ground, the trial court responded that it had not observed any yawning or

other behavior by the prosecutor that was "inappropriate." On this record, we cannot conclude that the prosecutor engaged in conduct that was a " ' " 'deceptive or reprehensible method[] to attempt to persuade . . . the jury.' " ' " (*People v. Earp, supra*, 20 Cal.4th at p. 858.)

Nor do we discern misconduct in the prosecutor's comment ("That's fine, Judge") after the trial court sustained a defense objection. When defense counsel objected to this comment as "self-serving" and "improper," the trial court disagreed, characterizing the comment as the equivalent of the prosecutor saying he would rephrase his question. Nor was it prejudicial misconduct for the prosecutor to describe a witness as "the Court's expert," when the trial court immediately interrupted, stating that the court itself had no "experts."

Finally, no prejudicial misconduct occurred during the testimony of prosecution witness Eulalia Gauss, who was murder victim Hamilton's next-door neighbor. Gauss testified that she had made notes on a coupon about what she saw on the night of the murder. When the prosecutor asked Gauss whether she still had the notes, she removed them from her purse. Defendant contends the witness's "dramatic search for the evidence" was a "hoax," staged by the prosecutor for "dramatic" effect. But on defense cross-examination Gauss testified that the prosecutor had not asked her to bring the notes to court. Defendant acknowledges that the prosecution supplied the defense with a copy of the notes on February 23, 1993, the day before Gauss testified, but he contends this too was improper because the prosecutor's investigator testified he obtained the notes from Gauss 19 days earlier, on February 5. Notably, defendant never mentions bringing to the trial court's attention the prosecution's delay in providing the defense with the notes. In any event, assuming defendant has preserved this claim, delay in providing Gauss's notes to defendant does not amount to a deceptive or reprehensible method of attempting to persuade either the court or the jury, and thus does not amount to prosecutorial misconduct.

### F. *Alleged Guilt Phase Instructional Error*

#### 1. *CALJIC No. 2.52*

At the prosecutor's request, and without objection, the trial court instructed the jury with a modified version of CALJIC No. 2.52, which told the jury it could infer consciousness of guilt from flight after a crime.[6] Defendant now

---

[6] The instruction stated: "The flight of a person, if any, immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. Whether or not evidence of flight shows [a]

contends this was error because he was arrested at the crime scene and, accordingly, there could be no flight.[7] We disagree.

 "Whenever the prosecution relies on evidence of flight as tending to show a defendant's guilt, the trial court must instruct the jury substantially in this language: 'The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine.' [Citation.] In this context, flight 'requires neither the physical act of running nor the reaching of a faraway haven' but it does require 'a purpose to avoid being observed or arrested.' [Citations.] 'Mere return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt [citations], but the circumstances of departure from the crime scene may sometimes do so.' [Citations.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 126 [41 Cal.Rptr.3d 319, 131 P.3d 400], italics omitted.)

Because neither running away nor reaching a "faraway haven" is necessary to establish flight, defendant is wrong that his arrest at the crime scene means there could have been no flight. When Fresno police officers arrived at the crime scene, Officer Manfredi saw defendant attempting to leave through the front door of victim Hamilton's house. When Manfredi announced the police presence, defendant turned and ran through the house, with Manfredi and another officer giving chase. Manfredi and a third officer, who was outside the house, saw defendant dive through a window. When the officers outside the house then tried to stop defendant, he resisted.

These circumstances were more than sufficient to support an inference that defendant was trying to escape, from which the jury could reasonably infer a consciousness of guilt. Therefore, the trial court properly instructed the jury on flight.

### 2. *Alleged misreading of instructions*

Defendant contends the trial court prejudicially erred by misreading instructions to the jury, and thereby violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We discuss these contentions below.

---

consciousness of guilt, and the significance, if any, to be attached to such a circumstance . . . are matters for your determination."

[7] The Attorney General contends this argument is forfeited because defendant failed to object at trial. Section 1259, however, permits appellate review of claims of instructional error affecting a defendant's substantial rights. (*People v. Prieto* (2003) 30 Cal.4th 226, 247 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; see *People v. Benavides* (2005) 35 Cal.4th 69, 100 [24 Cal.Rptr.3d 507, 105 P.3d 1099].) Therefore, we may assess this claim on its merits.

Defendant argues that in instructing the jury with CALJIC No. 14.50 (1990 rev.) (Burglary—Defined), modified to reflect the specific definition of residential burglary, the trial court improperly eliminated the distinction between first and second degree burglary. We disagree.

As read by the court, that instruction was: "Every person who enters the—any inhabited—inhabited dwelling with the specific intent to steal, take, and carry away the personal property of another of any value and with the further specific intent to deprive the owner permanently of such property is guilty of the crime of burglary, a violation of Penal Code section 459. [¶] It is immaterial whether the intent with which the act—it is immaterial whether the intent with which the entry was made was thereafter carried out. [¶] In order to prove such crime each of the following elements must be proved: [¶] that a person entered an inhabited dwelling house—*it should be, entered a building*. At the time of the entry such person had the specific intent to steal, take, and carry away someone else's property, and intended to deprive the owner permanently of such property."

The court then instructed the jury with CALJIC No. 14.51 (1990 rev.) in these words: "If you should find the defendant guilty of burglary, you must determine the degree thereof and state the degree in your verdict. There are two degrees of burglary. Every burglary of an inhabited dwelling house is burglary of the first degree. All other kinds of burglary are of the second degree."

In a later discussion on this subject outside the presence of the jury, the trial court told counsel, "[t]here is no possible way there could be any other degree . . . other than burglary of the first degree." Defense counsel agreed that "it's either first degree . . . burglary or nothing" and that "[t]here is no theory for second degree [burglary]."

The court then clarified certain instructions for the jury. After excusing the jury, the court stated for the record the results of an unreported bench conference, that "under the facts of this case" a jury determination on the degree of the burglary was unnecessary. The court added that because a jury determination of degree was unnecessary, the verdict forms regarding burglary were amended to reflect "burglary of the first degree."

"When considering a challenge to a jury instruction, we do not view the instruction in artificial isolation but rather in the context of the overall charge. [Citation.] For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction. [Citation.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 777 [60 Cal.Rptr.2d 1, 928 P.2d 485].) Here, there is no reasonable likelihood that the jury misunderstood or misapplied the instruction.

CALJIC No. 14.50 (as modified) told the jury that burglary required entry into a building with the requisite intent to take and permanently deprive the rightful owner of personal property. CALJIC No. 14.51 told the jury that burglary of an inhabited dwelling house is first degree burglary and all other burglaries were of the second degree. The jury returned a signed preprinted verdict form on count two finding defendant guilty of burglary of an inhabited dwelling. That verdict form indicated that burglary of an inhabited dwelling was first degree burglary. Thus, the verdict form did "state" the degree of burglary in that the jury would have found defendant not guilty of burglary if it did not agree with the description of burglary as printed on the form. Moreover, any error in instructing the jury with CALJIC No. 14.51 was harmless, because "[a]t most, the instruction was superfluous." (*People v. Crew, supra,* 31 Cal.4th at p. 849.)

Defendant also contends that in instructing the jury with CALJIC No. 2.51 (Motive), the trial court "omitted the word 'motive' from the first sentence, and connected the remainder of the instruction to an instruction on mental state, resulting in a nearly incomprehensible string of words." The instruction as read by the court stated: "You have also been instructed on the issue of other intent and knowledge and—which constitutes—which is an element of aiding and abetting and unless such intent and mental state exists, as you've previously been instructed—that status has not been established or is not an element of the crime charge [*sic*] and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt, absence of motive may tend to establish innocence. You will, therefore, give its presence or absence as the case may be the weight to which you find it entitled."

Defendant claims the trial court's instruction was erroneous and prejudicial because the jury did not have the written instructions until the last day of deliberations. (*People v. Osband* (1996) 13 Cal.4th 622, 687–688 [55 Cal.Rptr.2d 26, 919 P.2d 640] [trial court's error in misstating instructions was harmless when jurors had before them six correct copies of the written version of the instructions when they began deliberations].)

We find no prejudicial error in the trial court's instruction. Contrary to defendant's claim, the jurors had a copy of the correct version of CALJIC No. 2.51 throughout their deliberations. We presume the jury was guided by the correct, written version of CALJIC No. 2.51. (*People v. Osband, supra,* 13 Cal.4th at p. 688.) Any error the trial court committed with respect to instructing with CALJIC No. 2.51, therefore, was harmless.

### G. *Alleged Insufficiency of Evidence*

Defendant contends his attempted rape and attempted robbery convictions must be reversed, and the attempted rape-murder and attempted robbery-murder special-circumstances findings vacated, because the prosecution failed to present substantial evidence that defendant attempted to rape Hamilton or that he formed the intent to steal before or during, rather than after, he beat Hamilton. The absence of this evidence, defendant argues, renders the burglary-murder special circumstance invalid, because if defendant did not enter Hamilton's residence to commit theft or rape, there is no independent felony to provide a foundation for the burglary-murder special circumstance. We disagree.

"To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kipp, supra,* 26 Cal.4th at p. 1128; see also *People v. Mayfield, supra,* 14 Cal.4th at pp. 790–791 [same standard of review applies to determine the sufficiency of the evidence to support a special circumstance finding].) "Where, as here, the jury's findings rest to some degree upon circumstantial evidence, we must decide whether the circumstances reasonably justify those findings, 'but our opinion that the circumstances also might reasonably be reconciled with a contrary finding' does not render the evidence insubstantial." (*People v. Earp, supra,* 20 Cal.4th at pp. 887–888.)

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) Forcible rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator against the person's will by means of force or violence. (§ 261, subd. (a)(2).) Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) The intent to steal must be formed either before or during the commission of the act of force. (*People v. Kipp, supra,* 26 Cal.4th at p. 1128; see also *People v. Koontz* (2002) 27 Cal.4th 1041, 1080 [119 Cal.Rptr.2d 859, 46 P.3d 335]; *People v. Frye* (1998) 18 Cal.4th 894, 956 [77 Cal.Rptr.2d 25, 959 P.2d 183].) Burglary requires an entry into a specified structure with the intent to commit theft or any felony. (§ 459; *People v. Horning* (2004) 34 Cal.4th 871, 903 [22 Cal.Rptr.3d 305, 102 P.3d 228]; *People v. Davis* (1998) 18 Cal.4th 712, 723–724, fn. 7 [76 Cal.Rptr.2d 770, 958 P.2d 1083].)

 Under the felony-murder rule, a murder "committed in the perpetration of, or attempt to perpetrate" one of several enumerated felonies, including robbery, rape, and burglary is first degree murder. (§ 189.) The robbery-murder, rape-murder, and burglary-murder special circumstances apply to a murder "committed while the defendant was engaged in . . . the commission of, [or] attempted commission of" robbery, rape, and burglary, respectively. (§ 190.2, subd. (a)(17)(A), (C), (G).) "[T]o prove a felony-murder special-circumstance allegation, the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder." (*People v. Mendoza* (2000) 24 Cal.4th 130, 182 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

Here, the prosecution's theory was that defendant broke into Hamilton's house with the intent to steal money, and that once inside, he attempted to rape Hamilton and he beat her severely. In support, the prosecution presented evidence that defendant entered the house by forcing open a bedroom window, and that Hamilton's house was ransacked.

Regarding the attempted rape, the prosecution presented evidence that Hamilton was found unconscious on the floor of her residence, naked below the waist. When police encountered defendant at Hamilton's house, his belt was unfastened, and his pants were buttoned only at the top.

Hamilton was transported to a hospital where a sexual assault examination was performed 15 hours and 32 minutes after her arrival. The examining doctor noticed bruising at the vaginal opening, measuring approximately one square centimeter, which could have resulted from a penis's forceful entrance into Hamilton's vagina. The injury was between 12 and 24 hours old. Although no sperm was detected during the examination, Hamilton's genital area was washed twice before the sexual assault examination was performed.

Based on this evidence, a rational jury could find beyond a reasonable doubt that defendant entered the house with the intent to steal (thus committing burglary), and that he beat Hamilton to the point of incapacitation to facilitate the intended theft before ransacking the house (thus committing attempted robbery). Defendant, however, argues that the evidence also could suggest it was only after Hamilton was beaten into unconsciousness that defendant formed the specific intent to steal. The existence of this possibility, however, does not render the evidence insufficient. (*People v. Earp, supra*, 20 Cal.4th at pp. 887–888.)

 Further, a rational jury could find beyond a reasonable doubt that defendant attempted to rape Hamilton. In challenging the sufficiency of the

evidence of attempted rape, defendant first argues that the lack of sperm or seminal fluid on Hamilton indicates insufficient evidence of attempted rape. Ejaculation, however, is not an element of rape; all that is required is "sexual penetration, however slight." (§ 263.) Moreover, the absence of sperm or seminal fluid easily may be explained as a result of the cleansing of Hamilton's genitalia twice before the sexual assault examination was performed. Defendant also asserts that the doctor who performed the sexual assault examination could not say whether Hamilton had been raped. The doctor's actual testimony, however, reveals only that she was unwilling to state with medical certainty that a rape had occurred because she personally did not observe it. Finally, defendant relies on the testimony of the pathologist who performed Hamilton's autopsy that her exterior genital area showed no sign of trauma. The pathologist, however, was unaware that Hamilton may have been the victim of a sexual assault, so he did not perform a vaginal examination.

 We conclude that substantial evidence supports not only defendant's convictions for attempted rape and attempted robbery, but also the jury's findings on the attempted rape-murder, attempted robbery-murder, and burglary-murder special circumstance allegations.

## IV. PENALTY PHASE ISSUES

### A. *Alleged Improper Admission of Aggravating Evidence*

 Defendant claims the trial court erred by admitting evidence of defendant's criminal activity during three separate incidents that involved the use or attempted use of force or violence or the express or implied threat to use force or violence as aggravation under factor (b) of section 190.3. Evidence of actual or threatened violent criminal activity "that would allow a rational trier of fact to find the existence of such activity beyond a reasonable doubt" is admissible under factor (b). (*People v. Griffin, supra,* 33 Cal.4th at p. 584.) Such evidence must involve actual, attempted, or threatened force or violence against a person, and not merely to property. (*People v. Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782].) Although a trial court lacks discretion to exclude *all* factor (b) evidence on the ground it is inflammatory or lacking in probative value, it retains its traditional discretion to exclude specific evidence if it is misleading, cumulative, or unduly prejudicial. (*People v. Box* (2000) 23 Cal.4th 1153, 1200–1201 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

Before admitting evidence of defendant's criminal activity under section 190.3, factor (b), the trial court conducted a preliminary inquiry into its admissibility. (See *People v. Phillips* (1985) 41 Cal.3d 29, 72, fn. 25 [222

Cal.Rptr. 127, 711 P.2d 423].) We conclude the trial court properly exercised its discretion in admitting this evidence.

### 1. *Redondo Beach incident*

Outside the presence of the jury, Redondo Beach Police Officer Phillip Keenan testified that in the late hours of April 7, 1989, at the Redondo Beach Pier where he was interviewing two men, Marcus Robinson and Derrick Green, defendant and two other men walked by, and defendant made a derogatory statement. Later, as Robinson and Green were leaving the pier's parking lot, Robinson told Officer Keenan that the man who made the derogatory remark had pointed a gun at Robinson. According to Keenan, Robinson's description of the clothes worn by the gunman—a white T-shirt and green pants—matched the clothes defendant wore that evening. Immediately thereafter, Keenan stopped defendant and found a loaded gun in his car.

Defendant resisted arrest, and once in the patrol car, banged his head on the Plexiglas that separated the front and rear areas of the vehicle, gnawed and bit the seat, and kicked at the rear door window on the driver's side, shattering it. When police removed defendant from the patrol car, he kicked one of the arresting officers.

Defendant objected to the admission of the Redondo Beach incident on the grounds that the evidence was insufficient to identify defendant as the person who pulled a gun on Robinson at the pier, and that evidence of defendant's resisting arrest (§ 148) would be more prejudicial than probative. The trial court allowed the evidence of defendant's brandishing of the firearm and resisting arrest, but disallowed evidence that defendant bit the patrol car's upholstery.

Defendant now claims the trial court abused its discretion by allowing this evidence in aggravation. We disagree.

 "When testimony regarding the identity of the defendant as the perpetrator of the prior criminal act is equivocal, that circumstance affects the credibility of the witness, not the admissibility of his or her testimony. The trial court does not abuse its discretion if, '[v]iewing the totality of the evidence presented, a rational jury could conclude that defendant was the one' who committed the act. [Citation.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 991 [86 Cal.Rptr.2d 243, 978 P.2d 1171].)

That standard is met here with respect to the evidence of defendant brandishing a firearm. Although at the foundational hearing Robinson could not identify defendant, Officer Keenan testified that Robinson told him at the

time of the incident that the person who pulled the gun on him was the same person who made the derogatory statement earlier that evening, and Keenan identified that person as defendant. Further, Keenan found a loaded handgun in defendant's car. Moreover, as the trial court noted, defendant pleaded guilty to carrying a loaded firearm in public (§ 12031, subd. (a)) arising out of this incident. Under these circumstances, the trial court did not abuse its discretion in admitting the evidence.

 With respect to the evidence of defendant's resisting arrest, we have said that "when the prosecution has evidence of conduct by the defendant that [is admissible under section 190.3, factor (b)], evidence of the surrounding circumstances is admissible to give context to the episode, even though the surrounding circumstances include other criminal activity that would not be admissible by itself. [Citation.]" (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1013–1014 [30 Cal.Rptr.2d 818, 874 P.2d 248].)

That is the situation here. Under these circumstances, the trial court did not abuse its discretion in admitting evidence of defendant's resisting arrest.

### 2. *Possession of razors in jail*

Outside the presence of the jury, Fresno County Correctional Officer Lawrence Daluz testified that while searching defendant's cell in July 1991 he found a bare razor blade and a plastic razor that had been altered to expose about half of the blade. These items were considered contraband because of their altered condition, which facilitated their use as weapons. Daluz explained that a bare razor blade could be affixed to an object, such as a toothbrush, to create a weapon.

Fresno County Correctional Officer Gary Tatum testified that defendant tried to excuse his possession of the razors by stating he used them to cut the hair of other African-American inmates. But Tatum disbelieved this explanation because the razors used by other inmates to cut hair did not have the plastic broken to expose the blades.

Defendant objected to the admission of his possession of razors in jail as not constituting a violation of the Penal Code. The trial court disagreed, concluding that a bare razor blade may be considered a deadly weapon within the meaning of section 4574.[8]

Defendant claims this trial court ruling was an abuse of discretion. We disagree.

---

[8] Section 4574 provides, in pertinent part, "any person who, while lawfully confined in a jail . . . possesses therein any . . . deadly weapon, . . . is guilty of a felony . . . ."

In *People v. Gutierrez* (2002) 28 Cal.4th 1083 [124 Cal.Rptr.2d 373, 52 P.3d 572], we addressed a defendant's challenge to the prosecution's introduction under section 190.3, factor (b), of evidence that during pretrial custody he had possessed six loose razor blades and two safety razor heads containing blades. During the search that led to the discovery of those items, the defendant threatened to kill a deputy. We said the evidence of the defendant's possession of the items and their alteration, in violation of jailhouse rules, also constituted a violation of section 4574. (*People v. Gutierrez, supra*, 28 Cal.4th at p. 1152.) We concluded that the defendant's "possession of the razor blades for use as deadly weapons was validly considered as evidence in aggravation under section 190.3, factor (b), as it constituted 'criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.' " (*Id.* at p. 1153; see also *People v. Tuilaepa* (1992) 4 Cal.4th 569, 589 [15 Cal.Rptr.2d 382, 842 P.2d 1142].)

██ Defendant acknowledges our decision in *Gutierrez*, but he argues it is distinguishable because the defendant there "made a threat to kill a jailer." We are not persuaded. As we have previously explained, "mere possession of a potentially dangerous weapon in custody involves an implied threat of violence . . . ." (*People v. Martinez* (2003) 31 Cal.4th 673, 697 [3 Cal.Rptr.3d 648, 74 P.3d 748].) The circumstances of defendant's possession of the contraband, particularly when viewed together with his overall conduct while in custody—which included five rules violations for fighting—lead us to conclude that the trial court did not abuse its discretion in admitting the evidence of defendant's razor possession under section 190.3, factor (b).

### 3. *Fight in jail elevator*

Outside the presence of the jury, Fresno County Correctional Officer Lorrie Camplin testified that on October 3, 1991, she saw on a jail video monitor a fight in the jail elevator, during which one inmate struck another "several times." Camplin said there were at least six inmates in the elevator and described the aggressor as wearing a white T-shirt.

Camplin's fellow correctional officer, Ronald Rye, who met the elevator as it arrived on the floor, found that defendant was the only inmate in the elevator wearing a white T-shirt and that he had abrasions on his knuckles.

Defendant now claims the trial court abused its discretion in overruling a defense objection to this evidence. We disagree. From the testimony of Officers Camplin and Rye, a rational trier of fact could find the existence of violent activity by defendant beyond a reasonable doubt. (See *People v. Griffin, supra*, 33 Cal.4th at pp. 584–585.)

We also reject defendant's contention that the jail's failure to preserve the videotape showing the fight violated his right to due process. Due process does not impose upon law enforcement "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." (*Arizona v. Youngblood* (1988) 488 U.S. 51, 58 [102 L.Ed.2d 281, 109 S.Ct. 333].) Instead, a failure to preserve potentially useful evidence will rise to the level of a due process violation only if the defendant shows bad faith on the part of law enforcement. (*Ibid.*) Here, there was no such showing.

## B. *Alleged Intimidation of Jury Foreperson by Defense Witness*

On April 7, 1993, the jury foreperson informed the court of an incident in the hallway involving Valerie Hurd, defendant's cousin who had testified on his behalf earlier in the penalty phase, and Hurd's friend, Kelley Massoyan. One of these women looked at the foreperson and said: "He's innocent. He's innocent. Always will be." The two women then laughed. The foreperson said she "felt a little bit intimidated" by the encounter, but that it would not affect her ability to be fair and impartial. She added that she could put the incident aside and decide the case on the evidence and instructions.

Questioned by defense counsel, the foreperson denied feeling threatened by the incident. She was "bothered" that she could not get away from the women, and she said it was clear they intended her to hear what they had to say. Asked by defense counsel if there was anything about the incident that would prejudice her against defendant, the foreperson replied: "Absolutely not." The foreperson also admitted having told another juror that some people "made some comments" to her, but denied that she had revealed their contents.

The court also questioned Valerie Hurd, who claimed the jury foreperson "butted in" on a conversation she was having with Massoyan about another case. Hurd stated that she said to Massoyan, "I feel he's innocent," and surmised the foreperson thought Hurd was referring to defendant.

The trial court denied defendant's motion for a mistrial,[9] noting the foreperson confirmed the incident would not affect her ability to be fair and impartial or her ability to base her decision on the evidence and instructions. Defendant contends the trial court's ruling was not only state law error, but also violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. We disagree.

---

[9] Defendant explains that at the time of the mistrial motion, there were no remaining alternate jurors, so a penalty phase mistrial was the only possible remedy.

In reviewing rulings on motions for mistrial, we apply the deferential abuse of discretion standard. (*People v. McLain, supra,* 46 Cal.3d at p. 113.) "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" (*People v. Haskett, supra,* 30 Cal.3d at p. 854.)

Here, the trial court did not abuse its discretion in denying defendant's motion for a mistrial. The jury foreperson said the incident did not prejudice her against defendant and would not affect her ability to be fair and impartial or to follow the court's instructions. Because the court did not abuse its discretion in denying the mistrial motion, the ruling did not deny defendant his federal constitutional rights.

### C. Alleged Error With Respect to Prosecution Rebuttal

#### 1. Psychiatric evaluation of defendant

At the penalty phase, defendant offered the testimony of Clinical Psychologists Gretchen White and Garry Bredefeld. White testified that she performed a "psychosocial evaluation" of defendant, which she explained as "looking into the individual's background . . . constructing a biography of the individual . . . with particular emphasis to psychological themes or patterns that may have been particularly significant in the person's psychological development." To perform her evaluation, White interviewed defendant and some of his relatives and friends, and reviewed various records, including defendant's medical and school records, his mother's correctional records, and investigator's reports.

White testified that defendant experienced "numerous" and "significant" "stressors" throughout his childhood and adolescence that greatly affected his development and yielded long-term effects. White grouped the "stressors" into four primary categories. The first involved the many losses defendant experienced throughout his life. The second was psychological abuse defendant experienced, the third was school failure, and the fourth was the effect on defendant of growing up in a violent environment. White testified that defendant's ability to cope with these stressors was "not very good" and that he used alcohol as an escape at an early age. White also indicated that the stressors had increased over time, and that on the day before Hamilton was killed, defendant was involved in an altercation with his brother, during which his brother pulled a knife on him.

Although White was not asked to diagnose defendant, she testified that he was "significantly depressed" and that his depression, which was "ongoing"

and "chronic," likely developed in preadolescence. White pointed to defendant's desire to avoid school and thoughts of suicide, both of which manifested when he was a child, as indicative of his depression. She also described depression in great detail: "Depression is considered in the diagnostic terminology to be an affective disorder. It means that it is a disorder of mood along with anxiety disorders. And it can range from mild to severe and up through psychotic depression that I mentioned. It can also be short-term or long-term. It can be chronic. It can be situationally related, in which case it might be considered an adjustment reaction. You lose your job, you're depressed. It can also be due to biochemical factors and then we often see a family tendency. It may run in the family and those types of depression are commonly very rapidly helped with anti-depressant medication." White then testified that defendant's depression was not biochemical, but was "probably moderate and chronic" and further explained: "I wouldn't call it severe to the extent that maybe he needs to be hospitalized or could barely get out of bed. On the other hand, I would not call it mild in the sense that I think it was more serious in that I think the feelings of hopelessness, the on and off again thoughts of suicide, the sense of not much of a future are more serious symptoms than what I would consider mild."

White also testified to what she termed a "mental slowdown that sounded like [defendant] was having a difficult time concentrating and that something was on his mind." This behavior was related to her by defendant's friend, who described him as "being very spacey and being kind of nonresponsive in a group of people, sometimes kind of wandering off, finding it difficult to get his attention." Additionally, defendant's friend said defendant had told him his "brain hurt." Defendant's girlfriend told White that defendant mumbled and spoke to himself. White speculated defendant's "mental slowdown" could have been caused by (1) "possible seizure activity," (2) "a psychosis" or "schizophrenic process where maybe he was hearing voices sort of in his head," (3) "an extreme sort of internal pressure preoccupation," or (4) "a depression that's severe enough that it can cause psychotic symptoms."

Bredefeld testified that he was asked to perform a psychological and neuropsychological evaluation on defendant. To do that, he administered some 23 psychological, psychodiagnostic, and neuropsychological tests to defendant. He concluded defendant functioned "within the borderline range of intelligence," was "seriously impaired" in the area of abstract reasoning, and had "tremendous difficulty" with reading and deductive skills. Bredefeld also testified to defendant's "generalized cerebral inefficiency." The results of a Rorschach test indicated that defendant was "particularly depressed" and that the depression was chronic rather than situational. Defendant also scored "high on an indicator of suicide potential" on that same test. Another test, the Millon Clinical Multiaxial Inventory-II, also pointed to defendant's depression of "long-standing duration."

After Bredefeld testified, the prosecutor asked the trial court to order defendant to undergo an evaluation conducted by a prosecution expert for purposes of rebuttal. Defense counsel objected, arguing that defendant's mental condition was not tendered as an issue. Rather, the defense "presented a psychological social history of the defendant and his functioning and not necessarily his mental condition."

Relying on *People v. McPeters* (1992) 2 Cal.4th 1148 [9 Cal.Rptr.2d 834, 832 P.2d 146], the trial court concluded that defendant had tendered his mental condition as an issue, and on this basis it granted the prosecutor's request that defendant be evaluated by an expert of the prosecutor's choice. The court explained: "[C]ertainly the status of his mental condition, for example, the ability to engage in abstract reasoning, . . . that's been clearly tendered and as well as his chronically sad, depressed, hopeless state. These are mental conditions, although they may not rise to the status of mental illness, although if Dr. White's testimony is believed that moderate depression would be on a chronic basis would be a recognized mental illness . . . ." The court noted: "It is clear that as a mitigating factor the defendant has tendered his mental state to show a functioning at . . . as far as abstract thinking, ability to reason, functioning in writing or calculating at . . . one of the very lowest levels . . . and there is, of course, the moderate depression and the testimony offered by the psychologist was more than showing a character effect or a personality trait or habit. [¶] Dr. White described a very sad, withdrawn, lonely, isolated young man who is hopeless . . . and the fact that the defendant has produced a skilled psychologist who has given the defendant more tests . . . than just the usual ones, . . . a wide, lengthy battery of tests with subparts, the court concludes the defendant has tendered his mental state or mental condition."

Defense counsel told the trial court that defendant would refuse to participate in the court-ordered examination, which was scheduled for the next day. At the scheduled time, the prosecutor and his chosen expert, Psychiatrist Howard Terrell, arrived at the jail to interview defendant, with defense counsel present. For approximately five minutes, Dr. Terrell asked defendant questions, which he refused to answer. Defense counsel then terminated the interview.

Defense counsel asked the court to exclude any testimony about the aborted evaluation on both relevance and Evidence Code section 352 grounds. The trial court denied the request. Dr. Terrell then testified that his attempts to conduct a psychiatric evaluation of defendant were thwarted by defendant's refusal to participate. Dr. Terrell also testified that defense experts White and Bredefeld had insufficient evidence before them to conclude that defendant suffered from "major depression," psychosis, or schizophrenia.

Clinical Psychologist Michael Thackrey, Ph.D., also testified as a prosecution expert, questioning the soundness of defense expert Bredefeld's testing methods and conclusions.

Defendant now claims that the trial court erred by ordering a psychiatric evaluation by prosecution psychiatrist Dr. Terrell and by allowing Dr. Terrell to testify to defendant's refusal to participate in the evaluation. According to defendant, these errors violated his rights to silence, to counsel, to a fair trial, to a reliable penalty determination, and to due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the federal Constitution.

In *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1116 [77 Cal.Rptr.3d 287, 183 P.3d 1250] (*Verdin*), we recently held that a "trial court's order granting the prosecution access to [a defendant] for purposes of having a prosecution expert conduct a mental examination is a form of discovery that is not authorized by the criminal discovery statutes or any other statute, nor is it mandated by the United States Constitution." We explained that although *People v. McPeters, supra,* 2 Cal.4th 1148, authorized "such discovery" when a defendant had put his mental state in issue, "following Proposition 115[10] and the enactment of the exclusivity guidelines in section 1054, subdivision (e),[11]" we said, "we are no longer free to create such a rule of criminal procedure, untethered to a statutory or constitutional base." (*Verdin, supra,* at p. 1116.) Here, the trial court's authorization for defendant to submit to a psychiatric evaluation by a prosecution expert was contrary to our recent opinion in *Verdin*. Moreover, admission of Dr. Terrell's testimony regarding defendant's refusal to cooperate with the court-ordered psychiatric examination was also error. We conclude, however, that defendant suffered no possible prejudice.

When testifying on rebuttal, prosecution expert Dr. Terrell, a psychiatrist, called into question the conclusions and methodology of the defense experts, Psychologists White and Bredefeld. In this respect, Dr. Terrell's testimony was substantially similar to the testimony of prosecution Psychologist William Thackrey, who also testified at the penalty phase. Thus, even without Dr. Terrell's testimony, the jury still heard from Thackrey that the reliability of the defense expert testimony was questionable. Moreover, in criticizing the defense experts' methodology and conclusions, Dr. Terrell did not rely on

---

[10] Proposition 115, known as the "Crime Victims Justice Reform Act," "added both constitutional and statutory language authorizing reciprocal discovery in criminal cases." (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 363–364 [285 Cal.Rptr. 231, 815 P.2d 304]; see *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 286 [279 Cal.Rptr. 592, 807 P.2d 434].)

[11] Proposition 115 added a chapter to the Penal Code, beginning with section 1054, which sets forth the purposes of this new chapter. The purpose listed in section 1054, subdivision (e) is that "no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, or as mandated by the Constitution of the United States."

defendant's refusal to participate in the court-ordered examination. Additionally, the brutality of defendant's crimes—beating to death a frail, elderly, and particularly vulnerable woman in the course of burglarizing her home and attempting to rape and rob her—weighs heavily in aggravation under section 190.3, factor (a). Accordingly, it is not reasonably possible that the jury would have returned a penalty verdict of life without parole in this case rather than death if the trial court had not allowed Dr. Terrell to testify regarding defendant's refusal to cooperate with the court-ordered psychiatric examination. (*People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

### 2. *Alleged improper rebuttal evidence*

During Psychiatrist Terrell's testimony, the prosecutor asked if he had an opinion, based on his limited evaluation of defendant, his review of particular portions of trial testimony, his consultation with prosecution psychologist William Thackrey, and Dr. Terrell's courtroom observations of defendant, whether there was sufficient evidence to support a diagnosis of "major depression," psychosis, or schizophrenia. Defense counsel objected that the proposed testimony would constitute improper rebuttal evidence, but the trial court overruled the objection. Dr. Terrell then testified that the defense experts lacked sufficient bases to support a diagnosis of any of the three conditions.

During Psychologist Thackrey's testimony, the prosecutor asked if he had an opinion, based on his review of defense expert Bredefeld's notes from his interview of defendant, and on the results of the battery of tests Bredefeld administered, whether there was sufficient basis for Bredefeld to conclude that defendant suffered from a "neuropsychological disorder." After the trial court overruled a defense objection to the question as calling for improper rebuttal evidence, Thackrey testified that there was insufficient evidence to suggest defendant suffered from a "neurobehavioral disorder." Thackrey also testified, over defense objection, that there was insufficient evidence to suggest defendant suffered from posttraumatic stress disorder.

Defendant now claims the trial court erred by overruling defense objections to "improper rebuttal evidence" in the form of opinions of Dr. Terrell and Psychologist Thackrey as to defendant's mental condition. According to defendant, these errors violated his right under the federal Constitution's Eighth Amendment to a reliable penalty determination. We disagree.

 Prosecution rebuttal evidence must tend to disprove a fact of consequence on which the defendant has introduced evidence. (See *People v. Boyd, supra,* 38 Cal.3d at p. 776.) The scope of rebuttal evidence is within the trial court's discretion, and on appeal its ruling will not be disturbed absent " 'palpable abuse.' " (*People v. Raley* (1992) 2 Cal.4th 870, 912 [8 Cal.Rptr.2d 678, 830 P.2d 712].) None appears here.

The testimony of prosecution experts Terrell and Thackrey as just described was within the proper realm of rebuttal evidence. Dr. Terrell's testimony that nothing suggested defendant suffered from "major depression," "psychosis," or "schizophrenia" was proper rebuttal of defense expert White's testimony that defendant manifested signs of clinical depression. Although White did not label defendant's condition as "posttraumatic stress disorder" (a term used by prosecution psychologist Thackrey), she did describe defendant's coping mechanisms as "not very good" and characterized his drinking from an early age as a means of escape.

We reach a similar conclusion with respect to Thackrey's testimony that the data on which the defense experts relied was insufficient to suggest that defendant suffered from a "neurobehavioral disorder." Although the various expert witnesses for the defense and prosecution each used slightly different terminology, the testimony of the two prosecution expert witnesses was proper rebuttal, and the trial court in allowing that testimony did not commit "palpable error."

### D. *Alleged Penalty Phase Instructional Error*

Defendant contends the trial court erred when it modified the defense-proffered instruction on mercy and when it refused to instruct the jury that its sentencing choice would be carried out. According to defendant, these errors violated his United States Constitution Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

### 1. *Mercy instruction*

Defendant requested this instruction: "If a mitigating circumstance or an aspect of defendant's background or his character arouses mercy, sympathy, empathy, or compassion such as to persuade you that death is not the appropriate penalty, you may impose a sentence of life without possibility of parole." The trial court gave a modified version of the instruction: "If, after weighing all the relevant evidence, a mitigating circumstance or an aspect of defendant's background or his character arouses sympathy, pity, or compassion such as to persuade you that death is not the appropriate penalty, you may impose a penalty of life without possibility of parole."

Defendant contends that by omitting the word "mercy" from the instruction, the trial court removed the instruction's "vital core" and "effectively removed mercy from the jury's consideration." He claims the harm resulting from the "eviscerated" mercy instruction was compounded because the trial court immediately thereafter instructed the jury: "You may not apply any sympathetic factor merely because you may feel a sympathetic response to

any person who might be in the defendant's position." And he argues that the trial court's use of the introductory phrase—"[i]f, after weighing all the relevant evidence"—made the damage from the instruction "complete" because it told the jury to withhold its consideration of "sympathy, pity, or compassion" until after the jury completed the weighing process. We disagree.

Here, in addition to the modified defense instruction, the jury was instructed with CALJIC No. 8.85, which told the jury to consider "any sympathetic or other aspect of defendant's character or record that the defendant offers as a basis for a sentence less than death," and CALJIC No. 8.88, which told the jury it was "free to assign whatever moral or sympathetic value [it] deem[s] appropriate to each and all of the various factors [it is] permitted to consider." In closing argument, the defense explicitly told the jury it could exercise mercy toward defendant: "If you find anything in [defendant's] background that's been presented as evidence in this case that makes you have sympathy, passion, pity for him, *if looking at his background you have mercy*, you can then take that one thing and give him life without possibility of parole."

As defendant acknowledges, when a trial court instructs the jury with CALJIC Nos. 8.85 and 8.88, it need not give a specific instruction on mercy, even if requested. (*People v. Hughes* (2002) 27 Cal.4th 287, 403 [116 Cal.Rptr.2d 401, 39 P.3d 432]; see also *People v. Wader* (1993) 5 Cal.4th 610, 663 [20 Cal.Rptr.2d 788, 854 P.2d 80].) These two instructions adequately inform the jury that it may exercise mercy, even though the word "mercy" is not specifically mentioned or defined. Therefore, because the trial court instructed the jury with CALJIC Nos. 8.85 and 8.88, and defense counsel argued, without objection, that the jury could exercise mercy and thus sentence defendant to life without possibility of parole, "[w]e find no reason to believe that the jury may have been misled about its obligation to take into account mercy or any of defendant's mitigating evidence in making its penalty determination." (*People v. Hughes, supra*, 27 Cal.4th at p. 403.)

### 2. *Instruction that penalty decision will be carried out*

Defendant requested this instruction: "A sentence of life without possibility of parole means that Keone Wallace *will* remain in state prison for the rest of his life and will not be paroled at any time. A sentence of death means that Mr. Keone Wallace *will* be executed in the gas chamber or by lethal injection." The trial court declined the instruction, and instead instructed as follows: "You should assume that for purpose of your deliberations the penalty imposed by the jury will be carried out." It also instructed with CALJIC No. 8.88, which stated, in pertinent part: "It is now your duty to

determine which of the two penalties, death or confinement in the state prison for life without the possibility of parole, shall be imposed on the defendant."

 We have previously explained that because of the "possibility of appellate reversal or gubernatorial commutation or pardon, it would be inaccurate and therefore erroneous to instruct the jury that if it returns a death verdict, the sentence of death *will* inexorably be carried out. [Citations.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 378 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) The trial court was therefore correct in refusing defendant's proffered instruction. Furthermore, the instruction the trial court gave sufficiently addressed any questions or concerns the jury may have had regarding its sentencing choice. (*Id.* at pp. 378–379.)

 Finally, we have consistently held that the phrase "life without possibility of parole" as it appears in CALJIC No. 8.84 adequately informs the jury that a defendant sentenced to life imprisonment without possibility of parole is ineligible for parole. (*People v. Prieto, supra,* 30 Cal.4th at p. 270; *People v. Smithey, supra,* 20 Cal.4th at p. 1009.) We also have held that the United States Supreme Court decisions in *Kelly v. South Carolina* (2002) 534 U.S. 246 [151 L.Ed.2d 670, 122 S.Ct. 726], *Shafer v. South Carolina* (2001) 532 U.S. 36 [149 L.Ed.2d 178, 121 S.Ct. 1263], and *Simmons v. South Carolina* (1994) 512 U.S. 154 [129 L.Ed.2d 133, 114 S.Ct. 2187], do nothing to alter that conclusion. (*People v. Martinez, supra,* 31 Cal.4th at pp. 698–699.) We reaffirm those decisions here, and decline to reconsider them, finding no persuasive reason to do so.

### E. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor engaged in an egregious "pattern of misconduct" throughout the penalty phase, thereby denying defendant a fair trial and requiring this court to set aside the death judgment. We disagree.

As stated earlier (p. 1070, *ante*), a prosecutor commits misconduct under the federal standard by engaging in conduct that " ' " 'so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process.' " ' " (*People v. Earp, supra,* 20 Cal.4th at p. 858; see *Darden v. Wainwright, supra,* 477 U.S. at p. 181; *Donnelly v. DeChristoforo, supra,* 416 U.S. at p. 642.) But under state law, it is misconduct for a prosecutor to use " ' " 'deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Earp, supra,* 20 Cal.4th at p. 858; see *People v. Espinoza, supra,* 3 Cal.4th at p. 820; *People v. Price, supra,* 1 Cal.4th at p. 447.)

The defense preserves a claim of prosecutorial misconduct for appeal by making a timely objection at trial and asking the court to admonish the jury. (*People v. Earp, supra*, 20 Cal.4th at p. 858; *People v. Price, supra*, 1 Cal.4th at p. 447.) " '[O]therwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' " (*People v. Earp, supra*, 20 Cal.4th at p. 858.)

For prosecutorial misconduct at the penalty phase, we apply the reasonable-possibility standard of prejudice first articulated in *People v. Brown, supra*, 46 Cal.3d at page 448, and which, as we have later explained, is the "same in substance and effect" as the beyond-a-reasonable-doubt test for prejudice articulated in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*People v. Ashmus* (1991) 54 Cal.3d 932, 990 [2 Cal.Rptr.2d 112, 820 P.2d 214]; accord, *People v. Gonzalez* (2006) 38 Cal.4th 932, 960–961 [44 Cal.Rptr.3d 237, 135 P.3d 649].)

The first instance of alleged misconduct pertains to the prosecutor's reference to defendant's giving a false name after his April 1989 arrest in Redondo Beach for brandishing a pistol at Marcus Robinson and threatening to shoot him. The trial court ruled that evidence of the brandishing and the threat, together with evidence that defendant kicked out the patrol car window and kicked one of the arresting officers, was admissible in aggravation as criminal activity involving the use of force or violence. (See § 190.3, factor (b).) But the court ruled that defendant's use of a false name was *not admissible* as aggravating evidence. At the conclusion of his questioning of Officer Jim Acquarelli, the prosecutor asked "if the defendant offered you any name for himself." Acquarelli answered "yes," but did not elaborate. Defense counsel objected to the question as irrelevant, and that objection was sustained. Outside the jury's presence, the trial court ruled that the prosecutor's question was inadvertent and likely caused by the court's many rulings about the Redondo Beach incident. As the court explained, defendant's use of a false name resulted in his conviction under that name, thus requiring a stipulation by the parties to tie the abstract of judgment in that case to defendant. Absent that stipulation, the trial court said, the prosecutor's inquiry would have been "legitimate."

Assuming the sufficiency of defendant's relevance objection, he failed to request an admonition and thus has not preserved this claim. In any event, defendant suffered no possible prejudice from the prosecutor's question because the witness did not reveal that defendant had used a false name.

Defendant makes a similar claim of prosecutorial misconduct based on the testimony of two prosecution witnesses who referred to defendant by the name "Kevin Walker." Apparently, defendant had in the past been booked

into the Fresno County jail under that name. As a result, some forms generated in connection with this case referred to defendant as Kevin Walker. The trial court ordered the deletion of that name from any exhibits admitted into evidence, and the parties agreed that witnesses would be instructed to use defendant's real name. Nonetheless, two prosecution witnesses—fellow Fresno County jail inmate Anton McCray and Correctional Officer Mike Delgado—each referred three times to defendant as Kevin Walker. Defense counsel objected to these witnesses referring to defendant as Kevin Walker. Defendant now contends the references resulted from the prosecutor's failure to admonish the witnesses and thus show prosecutorial misconduct. Assuming this claim is preserved as prosecutorial misconduct, we see no possible prejudice. Nothing in the record suggests that the jury would have concluded from the testimony that defendant deceptively used a different name or that, if he did, it somehow made him more culpable.

We also see no possible prejudice from the prosecutor's questioning of defense witness Mary Hurd, defendant's aunt. As relevant here, Hurd testified that defendant went to live with his grandparents at age 10, and that she had never seen defendant drink alcohol. The trial court allowed the prosecutor on cross-examination to show Hurd a probation report prepared in connection with defendant's felony conviction for possession of cocaine for sale, although the court did not admit the report as evidence. Defense counsel objected to the prosecutor's question asking whether the probation report refreshed Hurd's recollection. We agree with the Attorney General that the prosecutor's "brief attempts to impeach [witness] Hurd" fell far short of "an egregious pattern of misconduct and did not infect the trial with unfairness." No possible prejudice to defendant appears.

We also discern no prejudicial misconduct in the prosecutor's asking rebuttal witness Clinical Psychologist Michael Thackrey for his "opinion" about the views expressed by a defense expert, Clinical Psychologist Garry Bredefeld. When defense counsel objected to the questioning, the trial court promptly admonished the prosecutor, stating: "One witness may not pass a judgment on the opinion of another expert witness. That's why we have 12 jurors here to decide that. [Thackrey] may give us his opinion as to what the results showed." Thereafter, the prosecutor rephrased his question.

Defendant makes another claim of prosecutorial misconduct pertaining to defense Psychologist Bredefeld. He asserts that the prosecutor attempted to "demean" the psychologist by "purposely omitt[ing]" his title of "Doctor." We disagree. When defense counsel raised this point at trial, the court responded: "My only comment is we all have doctor of jurisprudence degrees. [But] [w]e don't call each other doctor. And, therefore, I did not feel it was diminishing or depreciating the witness to call him mister rather than

doctor. I realize in some professions and in Europe if you have a doctor[ate] in Europe and they [don't] call you doctor . . . someone is in deep trouble. But we have different—different views." We agree with the trial court's comments.

Defendant further claims prosecutorial misconduct in the prosecutor's phrasing of a question to prosecution Psychiatrist Terrell. The prosecutor asked whether Dr. Terrell had attempted to conduct an examination of defendant "at my request and pursuant to an order of this court?" Before the witness could answer, the trial court interrupted and explained that the court had not ordered an examination *by Dr. Terrell*, but rather had "ordered that [an] examination could be made by a physician selected by the People." Defendant contends that the prosecutor's phrasing of the question was in defiance of the trial court's ruling, as requested by defense counsel, that Dr. Terrell not be allowed to testify that he had a court appointment to examine defendant. We see no possible prejudice. Assuming defendant has preserved this claim for review, the trial court's clarification left no doubt that the court merely authorized a psychiatric examination of defendant and that Dr. Terrell was the prosecution's choice to conduct that examination.

We likewise discern no prejudicial misconduct by the prosecutor in the penalty phase closing argument. Defendant contends that the prosecutor improperly argued that defendant's felony conviction and resulting incarceration had failed to act as deterrents. According to defendant, this argument urged the jury to consider factors in aggravation that are not specifically enumerated in section 190.3. We disagree. As the trial court advised the jury when defense counsel objected to this argument, the prosecutor was entitled to argue based not just on the evidence, but on the "reasonable inferences" to be drawn from it. The absence of any deterrent effect from defendant's earlier brushes with the law was one such reasonable inference.

Nor, contrary to defendant's contention, did the prosecutor's argument violate *People v. Boyd, supra*, 38 Cal.3d at pages 774 to 776, by suggesting that the absence of mitigating evidence qualifying under section 190.3, factor (k) ("[a]ny other circumstance which extenuates the gravity of the crime") was itself aggravating evidence. The prosecutor did no more than urge the jury that defendant's evidence in mitigation was not particularly weighty.

Also without merit is defendant's suggestion that, by arguing that defendant's case in mitigation failed to show defendant suffered from "[an] extreme mental or emotional disturbance," or from "mental disease or defects," the prosecutor was somehow committing *Skipper* error. (See *Skipper v. South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669] [penalty phase jury must be allowed to consider relevant evidence in mitigation].) Defendant

concedes that he did not object to this argument and thus has not preserved this claim for appeal. (See *People v. Earp, supra,* 20 Cal.4th at p. 858.) He contends, however, that his counsel rendered constitutionally deficient representation in failing to do so. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 104 S.Ct. 2052].) Not so. Because the prosecutor did not commit "*Skipper* error" in arguing the insufficiency of defendant's mental or emotional disturbance evidence, such an objection would have been futile.

Likewise not preserved for appeal is a claim of prosecutorial misconduct in the prosecutor's description of the penalty phase closing arguments of defendant's two trial attorneys as "the good-guy/bad-guy thing." Because no possible prejudice resulted from this brief comment, we also reject defendant's contention that his counsel's failure to object was ineffective assistance of counsel.

We also have reviewed the prosecutor's comment in closing argument that Clinical Psychologist White in testifying to defendant's social and family history relied on extensive criminal history for defendant's mother but "never asked for a rap sheet on the defendant." Defense counsel objected to this comment, but did not ask the court to admonish the jury to disregard it. Because such an admonition would have been sufficient to cure any harm from the comment, defendant has not preserved this issue for appeal. (*People v. Earp, supra,* 20 Cal.4th at p. 858; *People v. Price, supra,* 1 Cal.4th at p. 447.) In any event, the isolated reference to defendant's "rap sheet" did not constitute prejudicial misconduct under either the state or federal standard.

Considering all of defendant's contentions of prosecutorial misconduct at the guilt and penalty phases, we conclude there was no reasonable possibility the penalty verdict would have been different in the absence of any of these actions by the prosecutor.

## V. OTHER ISSUES

### A. *Denial of Automatic Application for Modification of Death Verdict*

Defendant contends the trial court erred when, in denying the automatic application for modification of the death verdict (§ 190.4, subd. (e)), it ignored mitigating evidence and failed to properly weigh factors in aggravation and mitigation, thus depriving him of a reliable penalty determination under the Eighth Amendment to the United States Constitution. Specifically, defendant claims that the trial court erred in failing to consider as mitigation his age (21 years old at the time of the crime) under section 190.3, factor (i),

and his mental state, alcoholism, and intoxication at the time of the offense under section 190.3, factors (d) and (h), and in finding that section 190.3, factor (k) was the only mitigating factor.

Because defendant failed to assert these claims when the trial court ruled on the motion, he has not preserved this issue. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1220 [96 Cal.Rptr.2d 1, 998 P.2d 969] [the contemporaneous objection rule applies to cases in which the modification hearing was conducted after this court's decision in *People v. Hill* (1992) 3 Cal.4th 959, 1013 [13 Cal.Rptr.2d 475, 839 P.2d 984], became final].) In any event, defendant's contention is without merit.

 "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding . . . . In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings." (§ 190.4, subd. (e).) In ruling on the application to modify, the trial court does not make an independent penalty determination, but instead reweighs the evidence of aggravating and mitigating circumstances and then determines whether the weight of the evidence supports the jury verdict. (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1334 [63 Cal.Rptr.3d 433, 163 P.3d 118].) On appeal, we independently review the trial court's ruling in light of the record, but we do not determine the penalty in the first instance. (*People v. Geier* (2007) 41 Cal.4th 555, 616 [61 Cal.Rptr.3d 580, 161 P.3d 104].)

Here, before ruling on the automatic application to modify the penalty verdict, the trial court stated that it would "now proceed independently to review the evidence in determining whether the aggravating circumstances outweigh the mitigating circumstances and whether they were equally balanced and whether, even though the aggravating circumstances may outweigh the mitigating circumstances, whether the penalty of life without possibility of parole rather than death is, under the evidence, the appropriate penalty." These remarks indicate that the trial court understood its duty under section 190.4, subdivision (e), to independently review the evidence and determine whether it supported the jury's findings. (See *People v. Geier, supra,* 41 Cal.4th at p. 617; *People v. Smith* (2003) 30 Cal.4th 581, 640 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

In doing so, the trial court thoroughly evaluated evidence applicable to each factor under section 190.3, including factors (d), (h), and (i). Rather than failing to consider these factors, as defendant claims, the trial court discussed at length the evidence offered in their support and found that it did not amount to statutory mitigation. This was proper. (*People v. Alfaro, supra,* 41 Cal.4th at p. 1334 [trial court is not required to find that evidence offered in mitigation does in fact mitigate].) The court concluded, after independently reviewing the penalty phase evidence, that "the factors in aggravation greatly outweigh[ed] the factors of extenuation or mitigation" and that death was the appropriate penalty. Under these circumstances, the trial court fulfilled its duty under section 190.4, subdivision (e).

### B. Constitutionality of California's Death Penalty Law and Instructions

Defendant contends California's death penalty law violates the federal Constitution in many respects. We have in the past rejected all of these claims, and we reject his invitation to revisit them.

California's death penalty law does not amount to cruel or unusual punishment. (*People v. Frierson* (1979) 25 Cal.3d 142, 183–186 [158 Cal.Rptr. 281, 599 P.2d 587].)

California's death penalty law adequately narrows the class of murderers eligible for the death penalty. (*People v. Tafoya* (2007) 42 Cal.4th 147, 197 [64 Cal.Rptr.3d 163, 164 P.3d 590].)

Factor (a) of section 190.3, which permits the jury to consider the "circumstances of the crime" in determining whether to impose the death penalty, is not unconstitutionally arbitrary or capricious. (*Tuilaepa v. California* (1994) 512 U.S. 967, 974–976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; see *People v. Tafoya, supra,* 42 Cal.4th at p. 197.)

Neither the federal nor the state Constitution, nor any recent decision of the United States Supreme Court, requires that a jury find beyond a reasonable doubt that death is the appropriate punishment, or that it must unanimously agree on the presence of a particular aggravating factor, and none of them prohibits a jury from imposing the death penalty unless it finds beyond a reasonable doubt that the circumstances in aggravation outweigh those in mitigation. Nor does the federal or state Constitution require the trial court to so instruct the jury. (*People v. Carey* (2007) 41 Cal.4th 109, 135–136 [59 Cal.Rptr.3d 172, 158 P.3d 743]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1429 [58 Cal.Rptr.3d 368, 157 P.3d 973].)

A prosecutor's discretion to select those eligible cases in which the death penalty is sought does not offend the federal or state Constitution. (*People v. Tafoya, supra,* 42 Cal.4th at p. 198.)

The delay inherent in death penalty appeals, including the delay in the appointment of appellate counsel, does not violate due process. (*People v. Dunkle* (2005) 36 Cal.4th 861, 942 [32 Cal.Rptr.3d 23, 116 P.3d 494].) Further, as defendant acknowledges, we have in the past declined to recognize the existence of a "right to a speedy appeal" as an offshoot of the United States Constitution Sixth Amendment's right to a speedy trial (*People v. Holt* (1997) 15 Cal.4th 619, 709 [63 Cal.Rptr.2d 782, 937 P.2d 213]), and we do so again here.

A challenge to California's method of execution, whether lethal injection or lethal gas, on the basis that it violates the Eighth Amendment of the United States Constitution, "[is] not cognizable on appeal because [it does] not affect the validity of the judgment itself and [does] not provide a basis for reversal of the judgment on appeal. [Citations.]" (*People v. Tafoya, supra,* 42 Cal.4th at p. 199.) Further, an attack on purported illegalities of the execution process is premature. (*People v. Rogers, supra,* 39 Cal.4th at p. 911.)

## C. *International Law*

Defendant contends he was denied the right to a fair trial by an independent tribunal in violation of customary international law as well as international treaties to which the United States is a party. We need not consider the applicability of international treaties and laws to defendant's appeal, however, because he has failed to establish his premise that he suffered violations of state or federal constitutional law. (*People v. Tafoya, supra,* 42 Cal.4th at p. 199.)

Defendant also claims that California's use of the death penalty as a "regular" form of punishment falls short of international norms of humanity and decency and therefore violates the Eighth and Fourteenth Amendments to the federal Constitution. This argument " 'is a variation on the familiar argument that California's death penalty law does not sufficiently narrow the class of death-eligible defendants to limit that class to the most serious offenders, a contention we have rejected in numerous decisions.' [Citations.]" (*People v. Carey, supra,* 41 Cal.4th at p. 135.)

## D. *Proportionality Review*

This court's refusal to conduct intercase proportionality review of a death sentence does not violate the federal Constitution. (*People v. Leonard, supra,*

40 Cal.4th at p. 1429.) But when a defendant requests intracase proportionality review, as defendant does here, we review the particular facts of the case to determine whether the death sentence is so disproportionate to the defendant's personal culpability as to violate the California Constitution's prohibition against cruel or unusual punishment. (See *People v. Rogers, supra*, 39 Cal.4th at p. 894; *People v. Steele* (2002) 27 Cal.4th 1230, 1269 [120 Cal.Rptr.2d 432, 47 P.3d 225]; *People v. Dillon* (1983) 34 Cal.3d 441, 478–489 [194 Cal.Rptr. 390, 668 P.2d 697].)

" 'To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.] If the court concludes that the penalty imposed is "grossly disproportionate to the defendant's individual culpability" [citation], or, stated another way, that the punishment " ' "shocks the conscience and offends fundamental notions of human dignity" ' " [citation], the court must invalidate the sentence as unconstitutional.' [Citation.]" (*People v. Leonard, supra*, 40 Cal.4th at pp. 1426–1427.)

In arguing that the death sentence is unconstitutional as applied to him, defendant stresses his youth (21 years old at the time of the murder), his "less than average" intelligence, his "mental health issues" and "difficult childhood and youth," his alcohol addiction and state of intoxication at the time of the crimes, his "minimal" prior criminal history, and the "paltry" evidence of unadjudicated criminal activity. We are not persuaded.

In the course of a residential burglary, defendant beat to death a frail, elderly woman who was particularly vulnerable because of her age and her poor physical condition. He also attempted to rob and sexually assault her. On these facts, the death sentence is not grossly disproportionate to defendant's culpability.

### E. *Cumulative Error*

Defendant argues that the cumulative effect of the guilt and penalty phase errors requires reversal of his conviction and death sentence even if no single error compels reversal. Having found no prejudicial error, we reject this contention.

## VI. Disposition

For the foregoing reasons, we affirm the judgment in its entirety.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied October 22, 2008, and the opinion was modified to read as printed above. Werdegar, J., did not participate therein.